UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Forrester Environmental
Services, Inc. and Keith E.
Forrester

     v.                             Civil No. 10-cv-154-JL
                                        Opinion No. 2011 DNH 212
Wheelabrator Technologies, Inc.

**MEMORANDUM ORDER**

The present action arises from a contentious dispute between two New Hampshire companies that compete with one another in the field of stabilizing heavy metals in incinerator ash.  Plaintiffs Keith Forrester and his company Forrester Environmental Services, Inc. sued Forrester's former employer, Wheelabrator Technologies, Inc., for allegedly interfering with Forrester's contractual relationship with a Taiwanese waste treatment company, Kobin Environmental Enterprise Co., Ltd.  Forrester claims that, after Kobin became dissatisfied with Wheelabrator's technology, he invented a special treatment to stabilize the lead in Kobin's incinerator ash.  He further alleges that when Wheelabrator learned that Kobin had switched to Forrester's treatment, it made false claims that its patents covered Forrester's treatment and demanded that Kobin pay it for using that treatment.

Plaintiffs have asserted claims for (1) unfair and deceptive trade practices in violation of the Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A, (2) tortious interference with contractual relationship, (3) tortious interference with prospective advantage, and (4) trade secret misappropriation in violation of the Uniform Trade Secrets Act, N.H. Rev. Stat. Ann. § 350-B.  Wheelabrator has asserted an amorphous counterclaim against the plaintiffs, alleging that they are using methods and technologies that are actually owned by Wheelabrator.  The counterclaim asks for a declaration of Wheelabrator's ownership, an accounting of profits, and injunctive relief.  This court has jurisdiction under 28 U.S.C. § 1331 (federal question) because Forrester's right to relief necessarily depends on resolution of substantial questions of federal patent law, including whether Wheelabrator misrepresented to Kobin the scope of the parties' respective patent rights.

Both parties moved for summary judgment.  Wheelabrator filed two separate motions for summary judgment on plaintiffs' claims, arguing that (1) they are barred by the three-year statute of limitations set forth in N.H. Rev. Stat. Ann. § 508:4, (2) they are not supported by the record evidence, and (3) the Consumer Protection Act does not apply here because most of the allegedly wrongful conduct took place in Taiwan, not New Hampshire.

Plaintiffs moved for partial summary judgment on the first three counts of their complaint, arguing that there is no genuine dispute as to any material fact regarding Wheelabrator's liability on those counts and that the only issue for trial is the amount of damages.  In addition, plaintiffs moved for summary judgment on Wheelabrator's counterclaim, arguing that it, too, is barred by the statute of limitations.

Except insofar as Wheelabrator seeks summary judgment on plaintiffs' claim for violation of the Uniform Trade Secrets Act, the motions are denied.  Because plaintiffs have not presented any evidence that Wheelabrator acquired, disclosed, or used any of their trade secrets, or indeed that Wheelabrator even possessed the secrets at issue, Wheelabrator is entitled to summary judgment on the trade secret claim.  With respect to plaintiffs' remaining claims, however, genuine issues remain as to a number of material facts.  These include when plaintiffs first learned of Wheelabrator's alleged misconduct, which marks the time at which the statute of limitations began running, and whether any of that misconduct took place in New Hampshire. Summary judgment is therefore inappropriate.  Plaintiffs' motion for summary judgment on Wheelabrator's counterclaim, which is premised solely upon the statute of limitations, is denied

because plaintiffs failed to plead that affirmative defense in their answer and have not sought leave of court to add it.

## I.  **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial.  See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (citing Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009)).  A fact is "material" if it could sway the outcome under applicable law. Id. (citing Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  In analyzing a summary judgment motion, the court must "view[] all facts and draw[] all reasonable inferences in the light most favorable to the non-moving party." Id.  But the court need not credit "conclusory allegations, improbable inferences, or unsupported speculation." Meuser, 564 F.3d at 515 (quotation omitted).

## II.  Background

### A.  *Factual history*[1]

#### 1. WES-PHix and FESI-BOND DRY

Forrester is a former employee of the corporate predecessor to Wheelabrator, which is primarily engaged in the business of operating municipal waste-to-energy facilities (in lay terms, burning trash to generate energy).  Forrester claims that while working at Wheelabrator in the late 1980s and early 1990s, he oversaw the invention of a process, "WES-PHix," that employed phosphate chemicals to immobilize toxic heavy metals such as lead and cadmium in incinerator ash.  (Wheelabrator disputes Forrester's role in the invention of WES-PHix, but this dispute is ultimately immaterial.)  The WES-PHix process involves adding the phosphates to the ash, where they are chemically bonded to the heavy metals.  The new compounds that result from the chemical bonding process are more stable and less soluble than the original chemical forms of the heavy metals, preventing the metals from leaching in dangerous concentrations.

---

[1]The following factual summary attempts to set forth the facts in the manner dictated by Rule 56 and applicable precedent. The court's task was needlessly complicated by the fact that nary an assertion of fact in any of the parties' memoranda has gone unchallenged.  That fairly accurately reflects the equivocal state of the evidence in this case.  Both sides could have saved themselves a great deal of effort and expense if they had candidly assessed the record before filing their motions.

Wheelabrator owns the U.S. patents for some of the aspects of WES-PHix, two of which name Forrester as inventor.[2] Wheelabrator asserts that there are also other, proprietary aspects of WES-PHix which it has chosen not to publicize.  The patents teach methods of immobilizing lead and cadmium through the use of "water soluble phosphates," which they define as phosphates "soluble in water at about 20º C at least to the extent of about five weight-volume percent."  Notwithstanding these teachings, Wheelabrator contends that WES-PHix will work with virtually any phosphate--even those substantially less soluble than those identified in its patents.  Where WES-PHix has been practiced in the United States, phosphoric acid is the most commonly employed phosphate, though triple super phosphate has also been used in some applications.

Forrester resigned or was terminated from Wheelabrator in 1992.  In conjunction with the end of his employment, Forrester executed an agreement in which, among other things, he agreed not to disclose any confidential information learned during his time there.[3]

---

[2]See U.S. Patents Nos. 4,737,356 (filed Nov. 28, 1986), 5,245,114 (filed May 21, 1991), and 5,430,233 (filed Mar. 22, 1991).

[3]Wheelabrator asserts that the agreement also obligated Forrester "to assign to [Wheelabrator] any and all technology

Forrester then started a competing business, Forrester Environmental Services, Inc. ("FESI"), and patented other methods for using phosphates to stabilize heavy metals.[4]  Forrester also developed a new--or at least what he says is a new--process for immobilizing heavy metals in incinerator ash, which FESI markets under the name "FESI-BOND DRY."  Like WES-PHix, FESI-BOND DRY uses phosphates to immobilize the metals, but the phosphates used in FESI-BOND DRY are significantly less soluble than those disclosed in Wheelabrator's patents.  Forrester also contends that while WES-PHix involves a "wet" application, wherein water is added to the mixture of phosphate and ash, FESI-BOND DRY has a "dry" application that does not require water.  Both Wheelabrator and FESI license or sell the right to practice their respective processes to companies that need to stabilize the heavy metals in their ash.

---

that he had developed, worked on, or invented arising out of his employment relationship with [Wheelabrator]."  Document no. 118 at 7.  That language, however, does not appear in the agreement and Wheelabrator has pointed to no other record evidence supporting this assertion.

[4]See U.S. Patents Nos. 5,860,908 (filed Oct. 7, 1996), 6,050,929 (filed Oct. 8, 1996), and 7,530,939 (filed Mar. 5, 2007).

### 2. Kobin

In February 2001, Wheelabrator granted Bio-Max Environmental Engineering Company, Ltd. an exclusive license to practice WES-PHix in Taiwan through December 31, 2005.  Bio-Max's license permitted it to sub-license the right to others in Taiwan.  Later in 2001, Bio-Max granted Kuo-bin Ceramic, Inc. Co., Ltd. ("Kobin")[5] a sub-license to practice WES-PHix at its Taipei, Taiwan facility through December 31, 2011.  Kobin's facility processes incinerator bottom ash that is generated off-site; ash processed there is later sold for use in concrete, fill, and asphalt, among other things.

Both the license and sub-license defined WES-PHix as "the process of stabilizing metals, such as lead and cadmium, in solid residues . . . using chemicals such as lime [and/or] phosphate, which has been developed by [Wheelabrator]."  The sub-license did not require Kobin to use WES-PHix to treat ash at its facility, but for each ton of ash it treated with WES-PHix, Kobin was required to pay a royalty to Bio-Max.  The sub-license also

---

[5]Kuo-Bin Ceramic, Inc. Co. subsequently changed its name to Kobin Environmental Enterprise Co., Ltd.  As the name change is not material to the issues presented in the parties' motions, the court adopts the parties' practice of referring to the company as "Kobin" both pre- and post-name change.

provided that if Bio-Max's license with Wheelabrator terminated or expired, Kobin would pay the royalty directly to Wheelabrator.

In mid-2004, FESI learned that Kobin was dissatisfied with WES-PHix--in part because of a strong odor it supposedly caused--and began discussions with Kobin about potentially licensing FESI-BOND DRY for use at Kobin's Taipei facility.  On August 24, 2004, Kobin entered into a "Stabilization Chemical Supply Agreement" with FESI, under which FESI granted Kobin an exclusive right to use FESI's heavy-metal-stabilization process in Taiwan and to market the process to other Taiwanese companies.  Kobin, in turn, agreed to purchase phosphates from FESI.  The agreement had a ten-year term, renewable at Kobin's election.

To treat the ash at Kobin's facility in a way that reduced the unpleasant odor associated with WES-PHix, Forrester developed a variation of the FESI-BOND DRY method that involved the use of dicalcium phosphate dihydrate powder, or "DCPDHP"--an off-the-shelf phosphate typically used as a dietary supplement for animals.  Kobin's engineers, with FESI's guidance, later conducted field testing to determine the appropriate "dosage" of DCPDHP to use.  Plaintiffs contend that the resulting method constituted a trade secret, and that they took steps to maintain its confidentiality.  But Wheelabrator contends that Kobin, with

9

plaintiffs' authorization, disclosed the method publicly on more than one occasion.[6]

In connection with Kobin's adoption of FESI's special method, FESI began to sell Kobin DCPDHP that it obtained from a supplier in Shanghai under the name "FESI-BOND DRY DCPDHP." Though FESI's sales of DCPDHP to Kobin were not uniform, from April 2005 through the fall of 2006 Kobin made regular monthly purchases of the chemical, paying FESI approximately $573,000 over that period.

Kobin's involvement with FESI did not go unnoticed.  In the fall of 2004, Wheelabrator learned that Kobin might replace WES-PHix with FESI's technology.  In e-mail exchanges with its Taiwanese agent[7] in late 2004 and early 2005, Wheelabrator considered how to respond to inquiries from Bio-Max regarding

---

[6]Wheelabrator asserts that Kobin--with plaintiffs' blessing--presented a paper that disclosed parts of the method, including the use of DCPDHP and the best methods for its application, at the North American Waste-to-Energy Conference in May 2006.  It also asserts that a less detailed version of the presentation was made available to a Taiwanese environmental protection agency. Plaintiffs maintain that these presentations did not disclose many of the finer points of the FESI method, such as the use of DCPDHP, what source of DCPDHP was used, or the means of applying DCPDHP to the ash.

[7]Plaintiffs have filed a motion to have certain statements of this agent, Jen Wu, deemed admissions of a party-opponent for purposes of Federal Rule of Evidence 801(d)(2).  That motion is denied as premature.  The court will, if necessary, rule on the hearsay status and admissibility of Mr. Wu's statements at trial.

whether the use of FESI-BOND DRY required Kobin to pay royalties
under the WES-PHix license arrangement.  During these exchanges,
Wheelabrator expressed the opinion that Forrester's "phosphate
treatment process would infringe our earlier bottom ash treatment
patent."  From the record evidence, it does not appear that this
opinion was passed on to Bio-Max or Kobin.  However, in April
2005, an attorney for Wheelabrator wrote a letter to Forrester
accusing plaintiffs of using Wheelabrator's proprietary
information and improperly interfering with its relationships
with Bio-Max and Kobin.  Plaintiffs promptly responded, with
Forrester sending a letter to Wheelabrator's attorney accusing it
of "provid[ing] misinformation relating to FESI-BOND technology
to its licensee in Taiwan, and disparag[ing] FESI and myself."
Despite reciprocal threats of legal action, neither party filed
suit against the other at that time.

On April 4, 2006, Forrester authored a letter to Kobin in
which he expressed an opinion that Wheelabrator had committed
"intellectual property fraud" against Bio-Max and Kobin by
claiming to hold Taiwanese patents for its technology, when in
fact it held no patents in Taiwan.  Forrester's letter further
stated that, because he had been financially impacted by "this
apparent fraud," he had requested that the U.S. Attorney General
investigate.  He also suggested that Kobin retain legal counsel

and consider requesting a refund of any money paid to
Wheelabrator under the WES-PHix sublicense.

### 3. Kobin's new license with Wheelabrator

In early December 2005, Kobin informed Bio-Max that Kobin
had stopped using WES-PHix and had started using FESI-BOND DRY.
Shortly thereafter, Bio-Max's license to practice WES-PHix in
Taiwan expired, and Kobin became obligated, under its sub-
license, to pay a royalty directly to Wheelabrator for any use of
WES-PHix.  In March 2006, Wheelabrator wrote to Kobin to address
what it viewed as Kobin's failure to pay these royalties, arguing
that "the definition of WES-PHix in the Sublicense Agreement
covers the use of any solid, liquid or chemical form of
phosphate."  The letter also stated that Kobin's use of any
"phosphate-based process to treat municipal waste combustion ash"
--which, though not explicitly expressed, would have included the
use of FESI-BOND DRY and DCPDHP--amounted to a use of WES-PHix.
The letter closed by threatening legal action if the required
royalties were not paid.  While plaintiffs maintain that Kobin
subsequently paid Wheelabrator royalties for its use of DCPDHP
and other FESI technology, that contention is not supported by
the record evidence plaintiffs rely upon.[8]

---

[8]Other than FESI's own interrogatory responses (which are
not based on personal knowledge of the royalties Kobin paid), the

Kobin and Wheelabrator met in Florida on March 28, 2006, to resolve their royalty dispute.  At the meeting, Kobin agreed in principle to sign a new license to use WES-PHix.  Over the next several months, Wheelabrator and Kobin negotiated the details of the new license.  Rather than licensing the right to use WES-PHix directly from Wheelabrator, Kobin asked that, for tax reasons, the new license be granted to EMMA Best Industrial Limited, an affiliated entity, which would then grant a sub-license to Kobin.

Kobin also asked for assurances that it would be able to use a "solid form (powder)" of WES-PHix rather than the "liquid type" it had originally used.  In response, Wheelabrator provided Kobin with an edited version of a 1996 paper about WES-PHix.  While the original version of the paper stated that "virtually any <u>soluble phosphate</u> will . . . work in the WES-PHix process," the edited version stated that "virtually any <u>phosphate source</u> will work in the WES-PHix process" (emphasis added).  Plaintiffs see this as further evidence that Wheelabrator deliberately overstated the

---

evidence plaintiffs cite in support of this contention indicates only that (1) at some undetermined point, Wheelabrator learned that Kobin was using triple super phosphate to treat ash at its facility, and (2) it did not learn that Kobin was using DCPDHP until after this action was filed.  <u>See</u> document no. 116 at 9 (cited references).  It does not indicate that Kobin paid Wheelabrator any royalties for its use of DCPDHP (or, for that matter, for its use of any other phosphate).  Royalties are not discussed at all in the excerpt of deposition testimony to which plaintiffs point.

scope of its intellectual property rights in order to "steal" Kobin's business away from FESI.

On November 8, 2006, Wheelabrator and EMMA executed the new license, and EMMA and Kobin executed a sub-license.  In contrast to Kobin's prior arrangement, the new license and sub-license required Kobin "to use WES-PHix to treat all solid residues" at its Taipei facility.  Furthermore, the definitions of WES-PHix included in the 2006 agreements differed from that set forth in the original agreements.  Borrowing language from Wheelabrator's March 2006 letter, the definition--which was also drafted by Wheelabrator--identified WES-PHix as

> the patented . . . and proprietary process of immobilization of metals, such as lead and cadmium in solid residues . . . using any solid, liquid or chemical form of phosphate and/or lime.  WES-PHix embodies Confidential Technical Information that is not in the public domain and that is only disclosed to licensees.

Like Kobin's 2001 sub-license, neither the new license nor the sub-license specified which chemicals should be used with WES-PHix or required Kobin to purchase chemicals from any particular source.  During the course of the 2006 contract negotiations, though, Kobin had asked Wheelabrator to recommend a solid form of phosphate to use with the WES-PHix process. Wheelabrator recommended the use of ordinary superphosphate ("OSP"), but also identified several other possibilities,

14

including triple super phosphate ("TSP").  According to
Wheelabrator, Kobin ultimately decided to use TSP.

Shortly thereafter, Kobin stopped purchasing DCPDHP from
FESI, and did not place another order for the phosphate with FESI
for over a year.

### 4. Kobin suspends its relationship with FESI

In early December 2006, Forrester began to suspect that
Kobin's sudden cessation of purchases might mean that it had
started dealing with Wheelabrator again.  On January 19, 2007, he
sent a letter to Kobin expressing concern that Kobin could be
considering resuming the use of WES-PHix at its plant in Taipei
or purchasing DCPDHP from a local source, reminding Kobin of the
comparative advantages of FESI-BOND DRY.  And, in an apparent
reference to his April 4, 2006 letter, Forrester "remind[ed]
KOBIN that FESI has proven that Wheelabrator and/or its agent
[misled] KOBIN regarding [Wheelabrator's] patent rights in
Taiwan."

In March 2007, Hangshin Shih, FESI's agent in Taiwan, also
contacted someone at Kobin to try to confirm whether it had
decided to stop using FESI-BOND DRY.  From the record before the
court, it appears that Kobin did not respond to either
Forrester's letter or Shih's inquiry.  At some point during the
next several months, FESI apparently concluded that Kobin had

15

decided to stop using FESI-BOND DRY and resume its use of WES-PHix.  In a letter dated May 30, 2007, Forrester expressed surprise "that KOBIN would reuse the WES-PHix process," but indicated that he "remain[ed] open to contract price and terms negotiations with Kobin that will allow Kobin to utilize our process while also meeting any budgetary demands of [its] bottom ash stabilization operations."  Again, Kobin does not appear to have responded.

At or around the same time, Kobin approached Wheelabrator and asked to restructure the existing license arrangement so Kobin could license the right to use WES-PHix directly from Wheelabrator, rather than sub-licensing it from EMMA. Wheelabrator agreed and prepared the appropriate documents, which cancelled the 2006 EMMA license and licensed WES-PHix directly to Kobin, for execution.

Dennis Chao, the Managing Director of Kobin's Project Division at this time, recalls that he negotiated the terms of the 2007 license with Mark Lyons of Wheelabrator and made edits to Wheelabrator's draft on behalf of Kobin.[9]  Among other things,

---

[9]Wheelabrator has filed a series of motions to strike Chao's testimony, alleging that he was paid for serving as a witness (which plaintiffs dispute) and engaged in criminal conduct related to Kobin, and that his testimony is therefore inherently untrustworthy.  As this court has observed on more than one occasion, though, it "is not permitted to make credibility

16

Chao recalls that Kobin--doubting that Wheelabrator's patents covered any solid form of phosphate--requested that the phrase "any solid form of phosphate and/or lime" be deleted from the license's definition of WES-PHix.  He has testified that Wheelabrator insisted that the phrase remain and "guaranteed" that its WES-PHix patents covered any solid, liquid or chemical form of phosphate.  Wheelabrator's witnesses claim that they never made any such guarantee.

It was on the basis of this guarantee, Chao claims, that Kobin believed that Wheelabrator alone owned the patent rights to

---

determinations at the summary judgment stage."  Antaeus Enters., Inc. v. Davidson, 774 F. Supp. 2d 409, 416 (D.N.H. 2011); see also Pure Barnyard, Inc. v. Organic Labs., Inc., 2011 DNH 035, 27 n.13 ("[C]redibility determinations are for the factfinder at trial, not for the court at summary judgment.").  Though the court may, in some circumstances, disregard summary judgment affidavits that are "inherently untrustworthy" insofar as they contradict earlier sworn testimony without providing any explanation for the discrepancy, see Fin-Brand Positioning, LLC v. Take 2 Dough Prods., Inc., 2011 DNH 200, 13-14, that is not the situation here.  The remaining arguments Wheelabrator makes in support of its motions--including that much of Chao's testimony lacks foundation, that his deposition was improper, and that his statements impermissibly seek to expand the scope of his agency--are also not grounds for disregarding his testimony at present, though Wheelabrator may of course renew these objections to that testimony at trial.

As to the balance of Wheelabrator's motions to strike, which challenge certain documentary evidence and testimony from Forrester, Hangshin Shih, and plaintiffs' experts, the motions are denied as moot, as the court has not considered the evidence in question when ruling on the parties' motions for summary judgment.  The motions are therefore denied, without prejudice to Wheelabrator renewing its objections at trial.

a process using solid phosphates in the treatment of incinerator ash.  Under a separate agreement with the local government, Kobin was obligated to contract only with companies owning the patent to certain technologies.  Accordingly, Kobin believed that it had no choice but to sign the new license agreement with Wheelabrator and to cease doing business with FESI entirely.

After the language of the new agreement had been finalized and approved by Kobin's management, Chao traveled to Hampton, New Hampshire on June 14, 2007, to meet with Lyons and formally sign the document.  Lyons maintains that there were no substantive negotiations of any kind at that meeting, and that Wheelabrator made no false statements to Kobin.  Chao, however, recalls that before he formally signed the agreement, he asked Lyons to re-confirm that the WES-PHix patents covered any solid form of phosphate and/or lime, and that Lyons did so.

After learning that Kobin had signed a new license with Wheelabrator, Shih and Forrester met with Chao and Jerry Chen of Kobin in Taipei on June 27, 2007.  At the meeting, Chao and Chen told Forrester that Kobin was terminating its supply agreement with FESI.  They also told him that Wheelabrator had claimed it held patents on the use of all solid phosphates, including DCPDHP.  Forrester maintains that this meeting was the first time he became aware of Wheelabrator's claims that its patents covered

18

the use of FESI's DCPDHP method.  Indeed, Forrester asserts that
because Wheelabrator's published patents taught the use of
phosphates that are "soluble in water at about 20º C at least to
the extent of about five weight-volume percent," he had no reason
to believe that Wheelabrator would consider DCPDHP--which does
not meet that definition--as suitable for WES-PHix.  After the
meeting, Chao sent FESI a copy of the definition of WES-PHix
contained in Kobin's new license agreement because he wanted to
prove that Wheelabrator had actually made that claim.

FESI was later able to persuade Kobin to resume purchasing
DCPDHP from it.  Kobin only did so, however, after demanding that
FESI agree to a significantly reduced price that left it with
less than a 20% profit margin on its sales of DCPDHP--as compared
to the nearly 100% profit margin it had earned on its previous
sales to Kobin.  Though Kobin purchased DCPDHP from FESI at this
reduced price from early 2008 to early 2009, FESI has made no
sales of DCPDHP to Kobin since the second quarter of 2009.  At
his deposition in this case, Forrester admitted that he did not
know why Kobin stopped purchasing DCPDHP from FESI again in 2009.

Kobin has continued to use WES-PHix at its Taiwan facility
under various license agreements with Wheelabrator.  Hangshin
Shih approached Forrester about possibly renegotiating a sales
agreement with Kobin in August 2010.  Forrester vetoed the idea,

responding that he had "no further energy, funds, trust, or time to devote to the Taiwan or China market."

### B.   *Procedural history*

Forrester and FESI initially brought suit against Wheelabrator in this court in late 2007.  See Forrester Enviro. Svcs., Inc. v. Wheelabrator Techs., Inc., No. 07-cv-404-JD (D.N.H. Dec. 14, 2007).  They asserted federal claims for patent infringement, see 35 § U.S.C. 271, and a Lanham Act violation, see 15 U.S.C. § 1125(a), as well as state-law claims for unfair or deceptive trade practices, see N.H. Rev. Stat. § 358-A, tortious interference with contractual relations, and tortious interference with prospective advantage.  Wheelabrator moved to dismiss the complaint, see Fed. R. Civ. P. 12(b)(6), arguing that Forrester could not state a claim for recovery under federal law because, among other things, the alleged patent infringement and Lanham Act violation occurred in a foreign country.  But before the court (DiClerico, D.J.) could rule on that motion, Forrester voluntarily dismissed the case without prejudice.  See Fed. R. Civ. P. 41(a)(1)(A)(I).

Forrester and FESI commenced the present action against Wheelabrator in New Hampshire Superior Court on February 23, 2010.  In their new action, they asserted the same three state-

law claims (unfair and deceptive practices, tortious interference with contract, and tortious interference with prospective advantage), but replaced the patent infringement claims with a state common-law claim for "misappropriation of proprietary method." Wheelabrator removed the case to this court, see 28 U.S.C. § 1441, and moved to dismiss the common-law misappropriation count, see Fed. R. Civ. P. 12(b)(6), arguing that it was preempted by federal patent law and New Hampshire's version of the Uniform Trade Secrets Act, N.H. Rev. Stat. Ann. § 350-B. The court later granted plaintiffs leave to amend their complaint to replace their common-law misappropriation claim with a claim under the Trade Secrets Act and denied Wheelabrator's motion to dismiss as moot. See document no. 37. The current version of the complaint asserts claims for unfair and deceptive practices in violation of N.H. Rev. Stat. Ann. § 358-A, tortious interference with contractual relations, and misappropriation of trade secrets in violation of N.H. Rev. Stat. Ann. § 350-B.

     In responding to both the original and amended complaints in this action, Wheelabrator asserted an amorphous counterclaim against Forrester and FESI. Wheelabrator alleges that Forrester had breached his contractual obligation to assign it the rights to any methods or technologies developed during his employment at Wheelabrator or the ensuing five-year period; failed to disclose

critical information to the United States Patent & Trademark Office when applying for patents; and used Wheelabrator's confidential business information, methods, technologies, and other intellectual property for his own benefit.  The counterclaim seeks a declaratory judgment that Wheelabrator actually owns the methods, technologies and other intellectual property that plaintiffs claim to own; an accounting; and injunctive relief.

The parties subsequently filed a flurry of summary judgment briefs, both before and after the close of discovery. Wheelabrator seeks summary judgment in its favor on all of plaintiffs' claims, while Forrester and FESI have moved for partial summary judgment as to liability on Counts I-III of their complaint and for summary judgment in their favor on Wheelabrator's counterclaim.

III. **Analysis**

A. ***The parties' cross-motions for summary judgment on Counts 1-3 of the complaint***

The parties' cross-motions for summary judgment on Counts 1-3 of the complaint are denied.  Wheelabrator's motion is based primarily on the theory that any injury to plaintiffs occurred no later than fall 2006, when Kobin stopped purchasing DCPDHP from

FESI, and that their claims are therefore barred under the applicable statute of limitations because plaintiffs did not bring suit until February 2010. See N.H. Rev. Stat. Ann. § 508:4, I.[10]

Under the statute, the limitations period on the plaintiffs' claims began running when they "[d]iscovered, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of."

———————————

[10]Wheelabrator has also relied upon N.H. Rev. Stat. Ann. § 358-A:3, IV-a, asserting that the statute "requires a claim to be brought within three years from the date a plaintiff knows or should have known of conduct that allegedly violates the statute." Document no. 36-1 at 19. While plaintiffs do not dispute this interpretation of section 358-A:3, IV-a, and it finds some support in the legislative history, it is contrary to the plain language of the statute. Cf. Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 8 (1st Cir. 2007) ("Court are not free to disregard the plain language of a statute and, instead, conjure up legislative purposes and intent out of thin air."). Rather than requiring plaintiffs to bring suit within three years of the date they learn of the violation, section 358-A:3, IV-a exempts "[t]ransactions entered into more than 3 years prior to the time the plaintiff knew, or reasonably should have known, of the conduct alleged to be in violation of this chapter" from the Consumer Protection Act. It does not govern the time period within which a plaintiff must bring suit. But see King v. Philip Morris, Inc., No. 99-C-856, 2000 WL 34016358, *12-13 (N.H. Sup. Ct. Nov. 2, 2000) (relying on legislative history to reach the opposite conclusion).
    Because the Consumer Protection Act contains no limitations provision applicable to this action, the court will apply section 508:4,I 's general statute of limitations to plaintiffs' Consumer Protection Act claim. See N.H. Rev. Stat. Ann. § 508:4, I (section 508:4's limitations period applies "[e]xcept as otherwise provided by law").

N.H. Rev. Stat. Ann. § 508:4.  Plaintiffs certainly knew of the
injury in the fall of 2006, when Kobin stopped its regular
monthly purchases of DCPDHP from FESI.  And there is a good deal
of evidence that plaintiffs either knew or should have known of
Wheelabrator's alleged misstatements to Kobin before February
2007.  As early as May 2005, Forrester accused Wheelabrator of
"provid[ing] misinformation relating to FESI-BOND technology to
its licensee in Taiwan, and disparag[ing] FESI and myself."  In
April 2006, he wrote to Kobin to state his belief that
Wheelabrator had committed "intellectual property fraud" against
it.  And in January 2007, he wrote to Kobin again to express his
concern that Kobin might be resuming its use of WES-PHix, and
reminded Kobin that Wheelabrator had previously overstated the
scope of its patent rights.

These letters, taken together, suggest that Forrester and
FESI had reason to believe that Wheelabrator had been untruthful
with Kobin regarding the scope of Wheelabrator's intellectual
property rights.  From this evidence, a trier of fact could
reasonably conclude that as soon as plaintiffs knew that Kobin
had ceased business with FESI and was considering resuming
business with Wheelabrator--which, the evidence suggests, might
be as early as September or October 2006--they should have
immediately suspected that this resulted from Wheelabrator again

overstating its rights.  Under this view of the evidence,
plaintiffs knew or should have known of Wheelabrator's misconduct
and its connection to their injury more than three years before
they brought this suit in February 2010.  For this reason alone,
plaintiffs' motion for summary judgment on Counts 1-3 is
denied.[11]

But that is not the only reasonable conclusion that could be
drawn from the evidence.  First, none of the letters accuses
Wheelabrator of falsely claiming to own the U.S. patent rights at
issue in this case.  Rather, the "intellectual property fraud"
referred to in the April 2006 letter (and referenced again in the
January 2007 letter) dealt with the scope of Wheelabrator's
Taiwan patent rights.  Second, the January 2007 letter does not
definitively indicate whether Forrester knew at that time that
Kobin had decided to resume business with Wheelabrator, or
whether he had merely surmised as much from Kobin's abrupt
cessation of DCPDHP purchases.

Third, and most importantly, there is also evidence that
plaintiffs <u>did</u> exercise reasonable care in trying to discover the

---

[11]That motion must also be denied because genuine disputes
exist as to a number of material facts, not least of which are
whether Wheelabrator actually misrepresented the scope of its
intellectual property rights or whether such misrepresentation
caused plaintiffs any legally-cognizable damages.

reason that Kobin stopped purchasing DCPDHP from them in 2006. In addition to the January 2007 letter, plaintiffs and their agents reached out to Kobin on several occasions to try to confirm that it had decided to stop doing business with them. Kobin did not respond.  Forrester testified that he was not able to confirm Kobin's position, or the reason for it, until the June 27, 2007 meeting in Taipei.  This evidence is sufficient to create a genuine issue of material fact as to whether the plaintiffs knew or should have known that Wheelabrator's alleged misstatements had caused their injury more than three years prior to the filing of this action.  Thus, to the extent Wheelabrator's motion is premised on the statute of limitations, it must be denied.

Wheelabrator's motion is also denied insofar as it is based on the merits of plaintiffs' claims.  A reasonable finder of fact could conclude, based upon the evidence of record, that Wheelabrator repeatedly and intentionally misrepresented that it owned intellectual property actually belonging to FESI, a competitor, with the purpose and effect of causing their mutual customer to terminate its contractual relationship with FESI. This is sufficient to make out a claim for intentional interference with contract or prospective advantage under New Hampshire law.  Those claims require a plaintiff to establish

26

that "(1) the plaintiff had an economic relationship [or contract] with a third party; (2) the defendant knew of this relationship [or contract]; (3) the defendant intentionally and improperly interfered with this relationship [or contract]; and (4) the plaintiff was damaged by such interference." Singer Asset Fin. Co., LLC v. Wyner, 156 N.H. 468, 478 (2007) (reciting elements of intentional interference with contract); see M&D Cycles, Inc. v. Amer. Honda Motor Co., Inc., 208 F. Supp. 2d 115, 119 (D.N.H. 2002) (reciting elements of intentional interference with prospective advantage).  While it is not the only rational view of the evidence, a factfinder could conclude that each of those elements is present.

Wheelabrator offers no clear reason why the same conduct does not also make out a claim for unfair and deceptive practices under the Consumer Protection Act.[12]  Contrary to Wheelabrator's one-line argument, the Consumer Protection Act may in fact be applied to "business transactions" concerning "sophisticated entities."  See document no. 36-1 at 22.  Our court of appeals has expressly noted that "[t]he unfair and deceptive practices

---

[12]Whether Wheelabrator's alleged conduct constitutes one of the fourteen types of enumerated conduct the Act prohibits, or, if not, whether it meets the "rascality" test, see Fin-Brand Positioning, LLC v. Take 2 Dough Productions, Inc., 2011 DNH 200, 24, are issues not addressed in depth by the parties' memoranda, so the court will ignore them at this point as well.

prohibited by the CPA appear to include transactions between business competitors as well as those involving ultimate consumers" and that "[t]here are no provisions which limit the Act's protection to ultimate 'consumers' alone." E. Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc., 40 F.3d 492, 497 (1st Cir. 1994); see also Pacamor Bearings, Inc. v. Minebea Co., Ltd., 918 F. Supp. 491, 499 (D.N.H. 1996) ("[P]laintiffs' 'competitor' status does not foreclose resort to the Consumer Protection Act for redress of their asserted injuries."). Moreover, the fact that some of Wheelabrator's alleged wrongful conduct may have taken place at the June 14, 2007 meeting between Kobin and Wheelabrator in New Hampshire--albeit a very small part of the overall picture--may subject Wheelabrator to liability under the Consumer Protection Act for the conduct of "trade or commerce within this state." See Pacamor, 918 F. Supp. at 504 (holding that Consumer Protection Act applies to "offending conduct" that takes place within New Hampshire). Whether plaintiffs can ultimately prove conduct within New Hampshire sufficient to give rise to liability under the Act is a question for trial.

**B.   *Wheelabrator's motion for summary judgment on Count IV (trade secret misappropriation)***

Count 4 of plaintiffs' complaint makes a claim under New Hampshire's version of the Uniform Trade Secrets Act, N.H. Rev. Stat. Ann. § 350-B.  The Act provides for injunctive and monetary relief for trade secret misappropriation.  N.H. Rev. Stat. Ann. § 350-B:2.  Wheelabrator argues that plaintiffs' claim under the Act fails for three reasons:  (1) it is barred by the statute of limitations, (2) plaintiffs cannot prove the existence of a trade secret because the alleged secret was generally known and publicly disclosed, and (3) plaintiffs cannot prove misappropriation.  While the court has doubts about the first two arguments, the third is correct.

UTSA defines "misappropriation" as:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    (1) Used improper means to acquire knowledge of the trade secret; or

    (2) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it; or acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

29

> (3) Before a material change of his position, knew or
> had reason to know that it was a trade secret and that
> knowledge of it had been acquired by accident or
> mistake.

Id. § 350-B:1, II.  A successful claim for misappropriation of

trade secrets, therefore, requires the defendant's acquisition,

use, or disclosure of the secret.  See, e.g., 4 Roger M. Milgrim

& Eric E. Bensen, Milgrim on Trade Secrets § 15.01[1][d], at 15-

116 n.85.3 (2010).

Plaintiffs have explained their theory of misappropriation

as follows:

> [Wheelabrator's] claim to Kobin of ownership of the patent
> for all solid phosphate stabilizers of ash, and acceptance
> of their subsequent license by EMMA and them Kobin, allowed
> [Wheelabrator] site access and the ability to license a
> FESI-developed, turn-key [lead] stabilization system and
> chemistry at Kobin which [it] did not own, engineer, invent,
> patent, or retain by license.  By falsely purporting to
> license as its own property the FESI-BOND DRY system
> facility operations under false pretenses, [Wheelabrator]
> misappropriated [FESI's] Trade Secrets . . . .

Document no. 104 at 10; see also document no. 116 at 18-19.  In

other words, plaintiffs claim that Wheelabrator misappropriated

their trade secrets by telling Kobin that it owned the rights to

the use of any solid form of phosphate to stabilize lead in

incinerator ash, and including in its licenses with EMMA and

Kobin an overly broad definition of WES-PHix that included the

special method of FESI-BOND DRY that Forrester had developed for

Kobin.  According to plaintiffs, this conduct constitutes either

30

a use or disclosure of their special method under N.H. Rev. Stat. Ann. § 350-B:1, II(b), see document no. 116 at 18; they do not argue that Wheelabrator "acquired" their method as that term is used in § 350-B:1, II(a).

This theory suffers from several shortcomings.  Among them, in responding to Wheelabrator's motion for summary judgment, plaintiffs have pointed to no evidence that Wheelabrator ever actually obtained knowledge of the alleged trade secret.  There is, for example, no testimony from any employee of Wheelabrator or Kobin that could establish that Kobin ever demonstrated or disclosed plaintiffs' special FESI-BOND DRY method to Wheelabrator.  In fact, Wheelabrator's Rule 30(b)(6) deponent testified that he did not learn that Kobin was using DCPDHP, a key component of plaintiffs' alleged secret, until after this lawsuit had been filed.  Even assuming that plaintiffs are correct in asserting that Wheelabrator had the right to "site access" at Kobin's facility, they have produced no evidence that Wheelabrator ever used or even attempted to use its site access to observe plaintiffs' method in action; again, Wheelabrator's 30(b)(6) deponent testified to the contrary, stating that he had never observed Kobin using plaintiffs' method.  And while direct evidence of a defendant's knowledge of the secret can sometimes be difficult to come by, plaintiffs also have not provided any

indirect evidence, such as Wheelabrator's use of plaintiffs'
method, or a method derived from it, at Kobin's facility or any
other facility.  There is no evidence before the court that
Wheelabrator could replicate FESI's special method for treating
ash if it so desired, or that it could explain to a third party
how to replicate that method.

The absence of such evidence is fatal to plaintiffs' claim
that Wheelabrator "disclosed" or "used" their alleged trade
secret within the meaning of N.H. Rev. Stat. Ann. § 350-B:1,
II(b).  Under the Act, the defendant's knowledge of the secret is
an integral element of both a disclosure and a use claim.  See
id. §§ 350-B:1, II(b)(1) (requiring that defendant "used improper
means to acquire knowledge of the trade secret"); II(b)(2)
(requiring that defendant "knew or had reason to know that his
knowledge of the trade secret" was acquired under certain
conditions); II(b)(3) (requiring that defendant "had reason to
know that it was a trade secret and that knowledge of it had been
acquired by accident or mistake") (emphasis added).  As the
United States District Court for the District of Connecticut,
interpreting that state's version of the Act, has explained, to
be held liable for use or disclosure, a defendant "must itself
have knowledge of and used or disclosed the Trade Secrets."
Control Module, Inc. v. Data Mgmt., Inc., No. 07-cv-475-AWT, 2007

WL 4333814, *4 (D. Conn. Dec. 10, 2007); see also Silvaco Data Sys. v. Intel Corp., 184 Cal. App. 4th 210, 225, 109 Cal. Rptr. 3d 27, 42 (2010) (holding that in order for plaintiff to prevail against defendant on UTSA claim, plaintiff "was obligated to establish that [defendant] had 'knowledge of the trade secret'"), overruled on other grounds by Kwikset Corp. v. Sup. Ct., 120 Cal. Rptr. 3d 741, 246 P.3d 877 (Cal. 2011).[13]

Even more fundamentally, Wheelabrator's alleged conduct does not constitute either "disclosure" or "use."  There is no evidence that Wheelabrator ever disclosed plaintiffs' secret to

---

[13]Because the general purpose of the Uniform Trade Secrets Act is to promote uniformity with respect to trade secret law, "the construction that other courts have given to the same provision" is instructive when construing a provision of the Act. Mortg. Specialists, Inc. v. Davey, 153 N.H. 764, 775 (2006).

It is useful to caution here that

[n]othing said here should be taken to suggest that a defendant cannot be liable for misappropriation unless he personally possessed knowledge of the trade secret.  He can of course acquire such knowledge, and indeed can conduct the entire misappropriation, vicariously, e.g., through an agent.  Further, constructive knowledge of the secret may well be sufficient, at least in some circumstances.  Thus one who knowingly possesses information constituting a trade secret cannot escape liability merely because he lacks the technical expertise to understand it, or does not speak the language in which it was written.

Silvaco, 184 Cal. App. 4th at 225 n.7, 109 Cal. Rptr. 3d at 42 n.76 (emphasis in original).  Neither situation is presented here.

any other person or entity.  Kobin, the only other party that
knew of the secret (at least as far as the record evidence
shows), learned of it from plaintiffs themselves, not from
Wheelabrator.  And while "'use' is a very broad concept," given
its most expansive definition by courts that hold that "any
exploitation of the trade secret that is likely to result in
injury to the trade secret owner or enrichment to the defendant"
constitutes "use," Cognis Corp. v. CHEMCENTRAL Corp., 430 F.
Supp. 2d 806, 812 (N.D. Ill. 2006) (quoting Restatement (Third)
of Unfair Competition § 40 cmt. c (1995)), it is not broad enough
to encompass Wheelabrator's alleged conduct.  What Wheelabrator
is alleged to have done is markedly different from the type of
acts usually constituting such "exploitation":  "marketing goods
that embody the trade secret, employing the trade secret in
manufacturing or production, relying on the trade secret to
assist or accelerate research or development, or soliciting
customers through the use of information that is a trade secret."
Id.  Wheelabrator, rather than actively exploiting its knowledge
or possession of the secret to its own advantage--the common
thread in each of these examples--simply claimed ownership of the
secret that it did not have.

    This court's conclusion that this conduct does not
constitute either "disclosure" or "use" finds further support in

34

Tao of Systems Integration, Inc. v. Analytical Services &
Materials, Inc., 299 F. Supp. 2d 565 (E.D. Va. 2004), a case
remarkably similar to this one.  There, as here, the plaintiff
alleged that the defendant misrepresented to a common client that
the defendant owned trade secrets that actually belonged to the
plaintiff, inducing the client to sign a valuable services
contract with the defendant.  Id. at 568.  The mere act of making
false statements about the ownership of the plaintiff's trade
secrets, the court concluded, was not "misappropriation" within
the meaning of the Uniform Trade Secrets Act because "[t]o
falsely claim to have certain information does not constitute the
acquisition, disclosure, or use of that information."  Id. at
576.  This court agrees.  Wheelabrator is entitled to summary
judgment on Count 4.

C.    **_Plaintiffs' motion for summary judgment on
      Wheelabrator's counterclaim_**

Forrester and FESI have also moved for summary judgment on
Wheelabrator's counterclaim.  As the sole basis for their motion,
they argue that Wheelabrator discovered its alleged injury more
than three years before asserting the counterclaim, such that the
counterclaim is barred by the statute of limitations.  Forrester
and FESI did not, however, assert a statute of limitations

defense in their reply to the counterclaim.  In their reply, they asserted only two "affirmative defenses":  first, that the counterclaim "fails to state a claim upon which relief may be granted," and second, that the counterclaim "is barred by the doctrine of laches."  Document no. 88 at 2.  They have not sought leave of court to amend their reply to add a statute of limitations defense.

Federal Rule of Civil Procedure 8(c)(1) provides that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . statute of limitations."  The rule does not distinguish between defenses to claims set forth in a complaint and those set forth in a counterclaim, and therefore requires a plaintiff responding to a counterclaim to state its affirmative defenses against the counterclaim.  See 5 Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1278, at 690 (2004) ("If the original answer contains a counterclaim . . . the plaintiff is obliged to reply to it and that pleading which, in effect, is an answer to that counterclaim, must contain any affirmative defenses the plaintiff may wish to assert against the counterclaim.").  Affirmative defenses not pleaded in an answer are waived.  See, e.g., Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F.3d 2, 11 (1st Cir. 2005); see also 5 Miller & Kane, supra, § 1278, at 644-

36

45 ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case.").

The purpose of the Rule 8(c) pleading requirement is "to give the opposing party notice of the defense and a chance to develop evidence and offer arguments to controvert the defense," Wolf v. Reliance Standard Life Ins. Co., 71 F.3d 444, 449 (1st Cir. 1995), such as "facts and legal arguments that require the tolling of the statute, whether by action of law, by agreement of the parties, or by equitable means," Harris v. Sec'y, U.S. Dep't of Veterans Affairs, 126 F.3d 339, (D.C. Cir. 1997). Accordingly, a court may excuse a party's failure to plead an affirmative defense if the opposing party has ample notice of it and time to conduct discovery so that no prejudice results. Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1226 (1st Cir. 1994); see also Conjugal P'Ship of Jones v. Conjugal P'ship of Pineda, 22 F.3d 391, 400 (1st Cir. 1994) ("[W]hen there is no prejudice and when fairness dictates, the strictures of the raise or waive rule may be relaxed.").[14]  On the present record,

---

[14]This standard is more forgiving than that applied in some circuits, which hold that once a party has waived an affirmative defense under Rule 8(c), it "cannot revive the defense in a memorandum in support of a motion for summary judgment." Lebouef

however, the court cannot excuse plaintiffs' failure to plead their statute of limitations defense.

Plaintiffs' motion, which was filed on August 30, 2011--long after the close of non-expert discovery in this case, and even longer after the deadline for amending pleadings--appears to be the first filing that squarely raises their statute of limitations defense.  It is clear that plaintiffs anticipated asserting, and had the opportunity to conduct discovery on, their statute of limitations defense--their motion is premised almost entirely on Wheelabrator's responses to their requests for admission.  But there is no indication in any of the documents before the court that Wheelabrator likewise had a full and fair opportunity to conduct discovery on it.  Though Wheelabrator has gamely responded to the plaintiffs' motion on the merits, its response relies primarily upon legal arguments and matters of public record, rather than evidence revealed during discovery.  Cf. Conjugal P'Ship, 22 F.3d at 401 (implied consent to trial of a new issue, and corresponding lack of prejudice by the

---

v. Island Operating Co., Inc., 342 Fed. Appx. 983, 984 (5th Cir. 2009); see also Harris, 126 F.3d at 339 (observing that permitting parties to raise affirmative defenses for the first time in dispositive motions undermines the structure dictated by Rules 8 and 15 and holding that "a party must first raise its affirmative defenses in a responsive pleading before it can raise them in a dispositive motion").

introduction of that issue into the case, can be found "where the opposing party actually produced evidence on the new issue"). The court thus cannot say that Wheelabrator has not been prejudiced by plaintiffs' late introduction of a statute of limitations defense.

The fact that plaintiffs have failed to plead their statute of limitations defense in their answer (or even to seek leave to amend to add it) is striking given that plaintiffs themselves repeatedly castigate Wheelabrator for raising affirmative defenses or theories of recovery that, they contend, were omitted from its answer and counterclaim.  See document 128, passim. With what measure ye mete, it shall be measured to you: Forrester and FESI may not rely upon a statute of limitations defense to Wheelabrator's counterclaim unless and until they are able to demonstrate grounds for amending their answer in accordance with Rule 15.  Their motion for summary judgment on Wheelabrator's counterclaim is therefore denied.

IV.  **Conclusion**

For the reasons set forth above, the parties' respective motions for summary judgment on Counts 1-3[15] are DENIED, Wheelabrator's motion for summary judgment on Count 4[16] is GRANTED, and plaintiffs' motion for summary judgment on Wheelabrator's counterclaim[17] is DENIED.  Plaintiffs' motion to file a supplemental declaration in objection to Wheelabrator's motion for summary judgment[18] is therefore DENIED as moot. Because the court grants summary judgment for Wheelabrator on plaintiffs' trade secret claim, Wheelabrator's motion in limine to preclude evidence of alleged disclosure of trade secrets[19] is DENIED.

As also described above, Wheelabrator's motions to strike certain evidence[20] are DENIED and plaintiffs' motion to have statements of Jen Wu deemed admissions[21] is DENIED.

_____

[15]Documents nos. 36 & 96.

[16]Document no. 101.

[17]Document no. 99.

[18]Document no. 76.

[19]Document no. 181.

[20]Document nos. 60, 111, & 117.

[21]Document no. 89.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: December 16, 2011

cc:  Erik Graham Moskowitz, Esq.
     Michael J. Markoff, Esq.
     Sibley P. Reppert, Esq.
     Steven E. Grill, Esq.
     Jonathan M. Shirley, Esq.