UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Forrester Environmental
Services, Inc. and Keith E.
Forrester

    v.                            Civil No. 10-cv-154-JL
                                Opinion No. 2012 DNH 138
Wheelabrator Technologies, Inc.


**FINDINGS OF FACT AND RULINGS OF LAW**

    The plaintiffs, Keith Forrester and his company, Forrester
Environmental Services, Inc., have sued defendant Wheelabrator
Technologies, Inc., alleging that Wheelabrator interfered with
plaintiffs' business relationship with a Taiwanese company, Kobin
Environmental Enterprise, by falsely claiming ownership of the
U.S. patent rights to plaintiffs' intellectual property, among
other things.  Because the plaintiffs' right to relief
necessarily depends on the resolution of substantial questions of
federal patent law, this court has jurisdiction pursuant to 28
U.S.C. §§ 1331 (federal question) and 1338 (patent).  See U.S.
Valves, Inc. v. Dray, 212 F.3d 1368, 1372 (Fed. Cir. 2000).

    The court previously granted summary judgment in favor of
Wheelabrator on one of plaintiffs' claims--for trade secret
misappropriation in violation of the Uniform Trade Secrets Act,
N.H. Rev. Stat. Ann. § 350-B--but denied Wheelabrator's motion as
to plaintiffs' remaining claims.  Those claims are:  (1) unfair

or deceptive trade practices in violation of the Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A, (2) tortious interference with contractual relationship, and (3) tortious interference with prospective advantage. Forrester Envtl. Servs., Inc. v. Wheelabrator Techs., Inc., 2011 DNH 212. Among other things, the court concluded that a genuine issue of material fact existed as to when plaintiffs first discovered (or should have discovered) Wheelabrator's alleged misconduct, the event that started the running of the limitations period under the so-called "discovery rule." Id. at 22-26.

Because the New Hampshire Supreme Court has held that the facts surrounding the application of the statute of limitations, and, concomitantly, the discovery rule, are to be decided by the court rather than the jury, see Keshishian v. CMC Radiologists, 142 N.H. 168, 179-80 (1997), this court conducted an evidentiary hearing on the limited issue of whether some or all of plaintiffs' claims are time-barred. Each of the parties submitted a set of proposed findings and rulings. With the assistance of these materials, the court makes the findings of fact and rulings of law set forth herein. See Fed. R. Civ. P. 52(a). As explained in detail below, the court finds that, with the exception of misrepresentations Wheelabrator allegedly made to Kobin on or around June 14, 2007, plaintiffs "[d]iscovered, or

in the exercise of reasonable diligence should have discovered," N.H. Rev. Stat. Ann. § 508:4, Wheelabrator's alleged misconduct and its causal connection to their damages no later than January 19, 2007.  Because this action was not filed until February 23, 2010, the court concludes that the three-year statute of limitations bars plaintiffs' claims, except to the extent they are premised upon the alleged June 14, 2007 misrepresentations.

### **Findings of Fact**

#### *I.   Relationship between the parties*

1.   Plaintiff Keith Forrester is a former employee of Wheelabrator Environmental Systems, the predecessor to defendant Wheelabrator Technologies, Inc.  When Forrester's employment with Wheelabrator ended in 1992, he formed his own company, plaintiff Forrester Environmental Systems, Inc. ("FESI").

2.   Both Wheelabrator and FESI provide goods and services related to the use of phosphates to stabilize heavy metals in incinerator ash and other industrial waste.  Wheelabrator refers to its proprietary treatments as WES-PHix, while FESI refers to its treatments as FESI-BOND.

3.   Dating back nearly to the founding of FESI in 1992, Forrester and Wheelabrator have regularly quarreled over

3

both the scope of their respective patent and intellectual
property rights and alleged interference with one another's
customers.  Or, as Forrester testified, he and Wheelabrator
have had "a fundamental disagreement" regarding the scope of
Wheelabrator's patents and intellectual property rights for
"a long time."

4.   In July 1998, Forrester wrote to Wheelabrator claiming that
one of its employees, Mark Lyons, had made false statements
to a customer which had "caused severe damage to [FESI's]
business."  Exh. I.

5.   In March 1999, FESI and Wheelabrator were competing for the
business of at least two potential customers.  During the
course of negotiations with these potential customers,
Forrester came into the possession of letters Wheelabrator
had sent them.  See Exhs. J-K.

6.   Forrester testified that, in his opinion, these letters
misrepresented the scope of Wheelabrator's intellectual
property rights.  Specifically, he testified that he
believed Wheelabrator overstated its patent rights by
representing that "the use of phosphate to treat
[incinerator] ash, either alone or in combination with any
other chemical agent(s), is covered by Wheelabrator's
patents" in a March 17, 1999 letter to Robert R. Becker of

4

HDR Engineering, Inc.  Forrester further testified that he believed Wheelabrator overstated its patent rights by representing that "the use of any form of water soluble phosphate to treat wire chopping waste, either alone or in combination with any other chemical agent(s), would infringe [Wheelabrator's U.S. Patent No. 5,430,233 (the "'233 Patent")]."  This statement appeared in Wheelabrator's March 28, 1999 letter to Martin S. Rifkin of OmniSource Corp.

7.  In May 2000, Forrester and Wheelabrator again butted heads. Wheelabrator's general counsel wrote to FESI expressing concern that FESI "may be offering to treat waste from metal reclamation processes with triple super phosphate," a treatment that he viewed as "rais[ing] a possible concern with respect to" the '233 Patent.  Exh. L.  Forrester responded in August of that year, stating that he did "not agree with [Wheelabrator's] broad interpretation" of its patent but confirming that FESI was "not offering technology as allowed under [the '233 Patent]."  Exh. M.

## II.  *Plaintiffs' relationship with Kobin*

8.  The parties' squabbles over customer relationships and intellectual property intensified in the mid-2000s.

9.   In August 2004, FESI entered into a chemical supply
     agreement with Kobin Environmental Enterprise Co., Ltd., a
     Taiwanese waste treatment company.  <u>See</u> Exh. 2.  At that
     time, Kobin had sublicensed the right to use WES-PHix to
     treat incinerator ash at its Taipei facility from
     Wheelabrator's Taiwanese licensee, Bio-Max Environmental
     Engineering Company, Ltd.

10.  Forrester had heard from FESI's representative for Taiwan,
     Hangshin Shih, that Kobin was dissatisfied with WES-PHix due
     in part to an unpleasant odor that it produced.  Forrester
     believed he could achieve the same results without an odor.
     He initially discussed two possible treatments with Kobin:
     one using triple super phosphate, or "TSP," and one using
     dicalcium phosphate dihydrate powder, or "DCPDHP."

11.  The following month, an outside attorney for Wheelabrator
     wrote to Forrester expressing concern that, among other
     things, FESI was "offering to the waste industry a process
     or processes for the treatment of wastes similar to those"
     embodied in Wheelabrator's patents, and identified the use
     of TSP as a method "fully disclosed in Wheelabrator's
     patents."  Exh. P.  The letter suggested that Forrester
     compare the claims of Wheelabrator's patents "to the
     processes you are offering to the waste-to-energy and other

6

industries," invited him to contact Wheelabrator to discuss licensing WES-PHix, and asked that he provide "details of your treatment process(es) and their relevance to the Wheelabrator patents." Id. The letter also contained a veiled threat of possible litigation against Forrester and FESI. Forrester promptly responded to this letter, disputing Wheelabrator's interpretation of the scope of its patents. See Exh. Q.

12. Neither of these letters specifically referenced either party's business relationship with Kobin. While these exchanges were taking place, however, FESI and Kobin were developing their business relationship pursuant to the August 2004 chemical supply agreement. Wheelabrator either knew of or suspected the existence of this relationship. Forrester testified that beginning some time in 2004, he learned from Kobin that Wheelabrator had been telling Kobin that it owned patent rights that, in his opinion, it did not own. Forrester continued to hear these reports from Kobin throughout the remainder of FESI's relationship with the company.

13. After conducting initial testing to identify a chemical treatment that would satisfy Kobin's requirements, FESI began selling Kobin DCPDHP on a regular basis beginning in

7

April 2005.  Forrester testified that he believed that the
use of DCPDHP to treat Kobin's incinerator ash did not
infringe upon any of Wheelabrator's patents, because
DCPDHP's water solubility was below that specified in those
patents.  In fact, Forrester testified that because his
method of treatment was "dry"--i.e., did not require the
addition of any water-it was altogether different from
Wheelabrator's method.

14. Nevertheless, on April 5, 2005, an outside attorney for
Wheelabrator wrote to FESI accusing it of "engag[ing] in
activities to interfere with contractual and other
advantageous relationships of [Wheelabrator] with . . . Kuo-
Bin Ceramic Ind. Co., Ltd."[1]  Exh. W.  The attorney also
charged that FESI had been "utilizing technical information
that [Wheelabrator] believes is owned by and proprietary to
[Wheelabrator]."  Id.  The letter demanded that FESI
"immediately cease and desist the aforementioned
activities."  Id.  Forrester's response denied that FESI had

---

[1]Kuo-Bin Ceramic is the former name of Kobin Environmental
Enterprise Co., Ltd.  As mentioned in the Court's order on the
parties' motions for summary judgment, the name change is not
material to the issues in this case.  See Forrester, 2011 DNH
212, 8 n.5.  In these findings and rulings, the court adopts the
parties' practice of referring to the company as "Kobin" both
pre- and post-name change.

engaged in any unlawful practices or that it had infringed Wheelabrator's patents.  <u>See</u> Exh. X.

15.   In May 2005, Forrester countered Wheelabrator's accusations of misconduct with a letter to Wheelabrator's outside attorney in which he accused Wheelabrator of engaging in misconduct of its own.  <u>See</u> Exh. BB.  In particular, the letter stated:

> It has come to our attention that [Wheelabrator] has provided misinformation relating to FESI-BOND technology to its licensee in Taiwan, and disparaged FESI and myself.  These actions by [Wheelabrator] are . . . in violation of US law regarding commercial and personal defamation.
>
> . . .
>
> We request that [Wheelabrator] cease providing any opinions or comments to licensees regarding FESI-BOND technology that are not supported by peer reviewed published data or [the] FESI website and FESI marketing documents.  FESI is prepared to file actions against [Wheelabrator] and seek treble and punitive damages for all losses associated with these marketing tactics allowed and supported by [Wheelabrator], if these illegal [Wheelabrator] communications result in FESI project losses or continue.

<u>Id.</u>

16.   Forrester testified that he wrote this letter after Kobin informed him of Wheelabrator's claim that FESI did not have experience with bottom ash stabilization in the United States.  The court did not find this testimony credible;

9

Forrester's demeanor when providing it only highlighted its implausibility, both as to the statements themselves and the circumstances under which they were purportedly made.[2]  At any rate, Forrester conceded that at the time he wrote this letter, he believed that Wheelabrator had "made a statement that . . . was derogatory and illegal" in an attempt to dissuade Kobin from doing business with him.

17. On February 10, 2006, Jerry Chen, Kobin's general manager, wrote to Hangshin Shih noting Kobin's "concerns over infringement of WHEELABRATOR phosphoric acid agent," and asking that FESI "provide the detailed content of technologies" in its patent applications.  Exh. NNN.  The letter further noted that Kobin had "always been concerned over whether the technology supplied by FESI to KOBIN . . . would fall into the coverage of WHEELABRATOR's technology or

---

[2]The court acknowledges that Forrester's motive for so testifying is not altogether clear.  One possible explanation is that the "misinformation" provided to Kobin by Wheelabrator was actually that its patents covered FESI's technologies, which would undermine Forrester's position that he did not know until mid-2007 that Wheelabrator had made such claims.  But it is equally possible that Forrester's accusations that Wheelabrator had provided "misinformation" were themselves fabrications, and Forrester did not want to admit that he had made those accusations without a good-faith basis.  The court therefore draws no conclusion as to whether Kobin actually made any statements regarding Wheelabrator prior to his May 2005 letter, and if so, the substance of any such statements.

not." <u>Id.</u>  Shih consulted Forrester about these questions, and, with Forrester's assistance, responded to Chen later the same day.  <u>See</u> Exh. OOO.  The response offered FESI's interpretation of Wheelabrator's patents, and sought to assure Chen that WES-PHix and FESI-BOND were "two totally different technologies."  <u>Id.</u>

18. The following month, Forrester and Hangshin Shih met with Jerry Chen and another Kobin representative, Bill Chen, at FESI's headquarters in New Hampshire.  Forrester claimed to have no memory of what happened at that meeting, and Shih's testimony was vague on that point.  Mere days before the meeting occurred, however, Wheelabrator's general counsel had sent Jerry Chen a letter claiming that WES-PHix "covers the use of any solid, liquid, or chemical form of phosphate," and demanding that Kobin pay it fees for its use of "a phosphate-based process" (i.e., FESI-BOND) to treat its ash.  Exh. GG.  So it is a reasonable, if not inescapable, inference that, at the meeting, Chen questioned Forrester about the claims made in this letter, and sought assurances that FESI-BOND was distinct from WES-PHix and that the WES-PHix patents did not, in fact, cover "any solid, liquid, or chemical form of phosphate."  Indeed, according to Shih's diary entries, the differences between

11

Wheelabrator's patents and FESI's patents were discussed at the meeting.  <u>See</u> Exh. 28.

19.  Shortly before that meeting, based upon his understanding that Wheelabrator had claimed to hold Taiwanese patents for its WES-PHix treatments, Forrester had retained a Taiwanese law firm to perform a search for any Wheelabrator patents on ash stabilization technologies.  On April 4, 2006, Forrester forwarded the results of that patent search to Kobin's general manager.  In his cover letter, he wrote:

> The attached search confirmed that **<u>Wheelabrator holds no patents covering incinerator bottom ash, combined ash, or flyash stabilization in Taiwan</u>**.
> . . .
>
> Given the above fact, it appears that KOBIN, and possibly Bio-Max . . . are victims of intellectual property fraud committed by Wheelabrator.  The exact language of the contract between [Wheelabrator] and Bio-Max, and between Bio-Max and KOBIN, will clarify where fraud was first committed and to what degree. . . .
>
> As a financially impacted party resulting from this apparent fraud, and given the recent threats against FESI by [Wheelabrator] relating to the use of [Wheelabrator] potential technology at KOBIN, I have copied legal counsel and further requesting [sic] the US Attorney Generals [sic] office to investigate this criminal case.  As we discussed, I suggest that you retain legal counsel in Taiwan and consider requesting a full refund of all licensee fees charged for the use of [Wheelabrator] technology in Taiwan.

Exh. 6 (emphasis in original).[3]

20.     In 2005, Kobin made payments for its DCPDHP orders from FESI
        on April 29, June 29, September 30, November 29, December 6,
        and December 29.  In 2006, Kobin made payments for its
        DCPDHP orders from FESI on January 17, February 15, April 7,
        June 30, August 15, August 29, September 15, October 5, and
        November 15.  Each payment corresponded to an order Kobin
        had placed several weeks earlier.

### III. *Kobin's termination of its relationship with plaintiffs*

21.     Forrester and FESI allege that throughout the remainder of
        2006, Wheelabrator further misrepresented the scope of its
        intellectual property rights to Kobin in various ways, which
        the court will not fully recount in detail here.  Among
        other things, Wheelabrator allegedly continued to tell Kobin
        that WES-PHix, as embodied in Wheelabrator's U.S. patents,
        encompassed the use of all solid forms of phosphate,
        including DCPDHP, to stabilize incinerator ash (essentially
        the same claim made in the letter Wheelabrator's general

---

[3]The court does not find it unusual that Forrester did not
write a similar letter to Kobin regarding Wheelabrator's United
States patents after learning of Wheelabrator's claims about
those patents at the March 2006 meeting with Kobin.  No such
letter would have been necessary because Forrester had already
addressed those patents both in his response to Kobin's February
10, 2006 letter and at the meeting.

counsel sent to Kobin in March 2006).  <u>See</u> Exh. GG.
Strictly for purposes of these findings and rulings, the
court accepts plaintiff's position that these statements
were false.

22. Kobin ordered a shipment of DCPDHP from FESI on or about
October 15, 2006, for which it paid $51,665 on November 15,
2006.  By early December, however, FESI had not received
another order from Kobin as expected, and Hangshin Shih and
Forrester became concerned.  On December 6, 2006, Shih
called Forrester and they spoke about Kobin's abrupt
cessation of orders.

23. Several weeks later, on December 27, 2006, Shih called Kobin
to inquire about its inconsistent orders.  Kobin informed
Shih that it would respond to him in two weeks, but no
response was forthcoming, so Shih called Kobin again on
January 17, 2007.  Kobin informed Shih that it was
considering several options, including resuming the use of
WES-PHix or purchasing DCPDHP from another source.  Shih
immediately relayed this information to Forrester.

24. On January 19, 2007, Forrester wrote to Kobin's general
manager regarding its cessation of orders from FESI.  The
letter expressed Forrester's concern about Kobin resuming
the use of WES-PHix:

14

> We understand . . . that KOBIN is considering
> reuse of WES-PHix for KOBIN's [incinerator ash]
> processing plant and/or purchase of FESI-BOND Dry
> chemical from local supply.  We fail to understand
> why KOBIN would consider reusing a technology that
> would produce off-gas products including odor,
> which had been complained by neighborhood *[sic]*
> and that will likely recur or even result in plant
> shutdown by the Taiwan environmental authorities.
> We also remind KOBIN that FESI has proven that
> Wheelabrator and/or its agent mislead *[sic]* KOBIN
> regarding WTI patent rights in Taiwan.

Exh. 9.

25. Neither Forrester nor Shih received a response to this
    letter, and Kobin did not place any orders with FESI in
    January or February 2007.

26. Forrester testified that as of February 23, 2007, he still
    did not know whether Kobin had decided to terminate its
    arrangement with FESI.  Forrester further testified that as
    of that date, he had no knowledge of any statements by
    Wheelabrator to Kobin regarding FESI's technology or other
    interference by Wheelabrator, including any claim by
    Wheelabrator that it owned the U.S. patent rights to the
    treatment of ash using DCPDHP.

27. The court does not credit Forrester's testimony on these
    points.  In many respects, that testimony is undermined by
    documentary evidence and contradicted by other parts of
    Forrester's testimony.  As early as May 2005, for example,

15

Forrester had accused Wheelabrator of providing "misinformation relating to FESI-BOND technology to its licensee in Taiwan," Exh. BB, and Forrester testified that he knew as early as 2004 that Wheelabrator had made statements to Kobin that were, in his opinion, false. As early as 1999, Forrester was also aware that Wheelabrator claimed that the "use of phosphate to treat [incinerator] ash, either alone or in combination with any other chemical agent(s), is covered by Wheelabrator's patents." See Exh. J. That statement was substantively similar to the allegedly false statement made by Wheelabrator's general counsel in his March 2006 letter to Kobin, see Exh. GG, which, as already mentioned, Kobin discussed with Forrester later that month.

28. By January 19, 2007, when he wrote to Kobin's general manager regarding its inconsistent orders, Forrester knew that Wheelabrator had told Kobin at least once that it owned the rights to ash stabilization processes using all solid forms of phosphate, and knew it was at least possible that this misrepresentation was the reason Kobin had discontinued its regular chemical purchases from FESI.

29. By the end of May 2007, Forrester knew that FESI had lost Kobin's business to Wheelabrator. This knowledge is

evidenced by his May 30, 2007 letter to Kobin's general

manager, in which Forrester wrote:

> In regards to termination of FESI-BOND DRY-W usage
> at Kobin, there remain some open action items due
> from KOBIN including return of FESI documents such
> as certificate of FESI registration and project
> references.
>
> On a related subject, I remain surprised that
> KOBIN would reuse the WES-PHix process . . . .  I
> remain open to contract price and terms
> negotiations with Kobin that will allow Kobin to
> utilize our process while also meeting any
> budgetary demands of your bottom ash stabilization
> operations.

Exh. 10.

30.  Plaintiffs maintain, however, that Wheelabrator's alleged

misconduct had not ended.  Dennis Chao, formerly a

subordinate of Jerry Chen's at Kobin, testified to a similar

statement by Wheelabrator at a June 14, 2007, meeting at its

headquarters in New Hampshire.  Chao attended the meeting to

execute a new WES-PHix licensing agreement between Kobin and

Wheelabrator.  Mark Lyons attended the meeting on behalf of

Wheelabrator.

31.  According to Chao, although the terms of the agreement had

been previously negotiated, Kobin gave him responsibility

for reviewing and modifying them on Kobin's behalf prior to

signing the agreement.  Chao says that, before signing the

contract, he asked Lyons whether it was true that

Wheelabrator's patents covered the use of any solid form of phosphate, and Lyons answered in the affirmative.  Having received this assurance, Chao then executed the agreement on behalf of Kobin.[4]

32. On June 27, 2007, Forrester traveled to Taipei, Taiwan to discuss the status of FESI's contract with Kobin representatives.  Dr. Hangshin Shih also attended the meeting on behalf of FESI.

33. Forrester and Shih testified that Kobin had requested this meeting, but the court does not find their testimony on this point credible.  The more likely scenario is that Forrester himself requested this meeting to attempt to persuade Kobin to resume purchasing DCPDHP from FESI.  That version of events is consistent with the testimony of Dennis Chao, who claimed that Shih had contacted him to arrange the meeting.  Moreover, in a contemporaneous e-mail to Chao, Shih thanked him for his assistance in arranging the meeting, which suggests that it was Shih or Forrester, not Kobin, who requested it.  See Exh. 13.

---

[4]Though, as discussed infra, the court does not find Chao credible, for present purposes the court accepts as true his account of the meeting with Lyons.

34. For purposes of these findings and rulings, the court accepts as true plaintiffs' claim that at this meeting, Kobin's representatives told Forrester that Wheelabrator had, at its June 14 meeting with Kobin, again claimed to own the rights to ash stabilization processes using all solid forms of phosphate under both its patents and its contract with Kobin.  This was substantively identical to the claim Forrester learned about in his March 2006 meeting with Kobin representatives in New Hampshire.

35. Forrester also testified that Kobin verbally informed FESI at this meeting that it was terminating the Kobin/FESI chemical supply agreement.  The court also does not credit this testimony.  Among other things, it is inconsistent with Shih's diary entry memorializing the meeting, which does not mention the supposed termination, but does mention a revision to the "price structure/schedule."  Exh. 30.  This suggests that the parties presumed the contract would remain in force following the meeting.  A letter Forrester wrote to Jerry Chen in August 2007 also seems to presuppose that the contract remains in force (though it is arguably ambiguous on this point).  See Exh. 19.

36. Kobin never formally terminated its chemical supply agreement with FESI in writing, as contemplated by the

19

agreement itself.  Kobin placed no orders under the chemical
supply agreement, however, from October 2006 onward.
Although Kobin briefly resumed purchasing DCPDHP from FESI
in 2008, those later purchases were each made on single-sale
basis, pursuant to a separate contract between Kobin and
FESI.  <u>See</u> Exhs. 33-34.

37.  Forrester and FESI commenced this action against
Wheelabrator on February 23, 2010.

## IV.  *Credibility of the witnesses*

38.  In addition to the specific instances of less-than-credible
testimony noted above, the court did not find Forrester,
Shih, or Chao to be credible witnesses as a general matter.
The demeanor, delivery, and tone of all three witnesses
undermined their credibility and created the impression
that, while perhaps not fabricating testimony outright, they
were at a minimum shading their answers and striving to
support the plaintiffs' position on the issue at bar.

39.  Forrester also conceded in his testimony that after he
initially filed suit against Wheelabrator in late 2007,[5] he

---

[5]Well over two years before filing the case at bar,
Forrester and FESI filed a previous action against Wheelabrator
in this court.  <u>See</u> <u>Forrester Envtl. Servs., Inc. et al. v.</u>
<u>Wheelabrator Techs., Inc.</u>, No. 07-cv-404-JD (D.N.H. Dec. 14,
2007).  The subject-matter of that action was substantially

identical to this one; plaintiffs sought to hold Wheelabrator
accountable for making false statements to Kobin "[i]n or around
the period January - June, 2007" and thereby causing Kobin to
"terminate" its agreement with FESI.  (Both the original and
amended complaints in that action, though, alleged that the
"termination" occurred "[i]n or around May, 2007"--not, as
plaintiffs now argue, in or around June 2007.)  As in the present
action, the complaints in the previous action purported to state
claims under the New Hampshire Consumer Protection Act and for
tortious interference with contractual relationship and
prospective advantage.  They also purported to state federal
claims for patent infringement, see 35 U.S.C. § 271, and
violation of the Lanham Act, 15 U.S.C. § 1051 et seq.  On
September 5, 2008, after Wheelabrator had moved to dismiss that
action, but before the court had ruled on that motion, Forrester
and FESI filed a stipulation of dismissal pursuant to Federal
Rule of Civil Procedure 41(a)(1).

     Plaintiffs' original complaint in this action likewise
alleged that Wheelabrator had made false statements to Kobin
"[i]n or around the period January - June, 2007"; plaintiffs
subsequently amended their complaint to allege instead that this
occurred "[i]n or around June, 2007."  Both the original and
first amended complaints omitted the federal claims from the
previous action, replacing them with a common-law claim for
"misappropriation of proprietary method."  Wheelabrator moved to
dismiss that claim, arguing that it was pre-empted by federal
patent law and New Hampshire's version of the Uniform Trade
Secrets Act ("NHUTSA"), N.H. Rev. Stat. Ann. § 350-B.  Forrester
and FESI responded by asserting that their complaints' references
to New Hampshire common law were "incorrect," and that they
actually intended to state a claim under the NHUTSA
(notwithstanding the fact that, as they conceded, most of the
allegedly misappropriated information had already been disclosed
in United States patents prior to the misappropriation, and hence
could not be considered a trade secret).  Accepting this
representation at face value, the court denied Wheelabrator's
motion to dismiss and granted plaintiffs leave to amend their
complaint to replace their common-law misappropriation claim with
a NHUTSA claim.  See Order of March 7, 2011 (document no. 37).
Ultimately, the court granted summary judgment to Wheelabrator on
that claim after plaintiffs were not able to produce any evidence
that Wheelabrator misappropriated their alleged trade secrets, see

21

had instructed Shih to destroy e-mails and other documents "[r]elating to the Kobin project with FESI technologies," and that he himself had destroyed potentially relevant documents. Forrester's excuse for the destruction--that it was his "practice to delete" documents that he didn't think were "important" on a daily basis, and that he wanted Shih to delete documents he considered to be "FESI confidential" --was not believable. While the precise relevance of the destroyed documents to the statute of limitations question is unclear (though they were undoubtedly relevant to the merits of this action), Forrester's actions created the impression that he is not unwilling to alter or obfuscate relevant evidence to facilitate findings consistent with his various positions in this litigation, which in turn undermined his credibility as a witness.

40. Hangshin Shih's testimony was also unreliable. Shih was repeatedly asked whether Forrester promised him a share of the recovery in this case. His responses were consistently evasive. Shih's testimony on this matter, moreover, was marked by (1) unusually long pauses between the questions posed to him and his answers; and (2) a nervous and ashamed

---

Forrester Envtl. Servs., Inc. v. Wheelabrator Techs., Inc., 2011 DNH 212, 29-35, leaving the three claims now before the court.

mien.  Forrester ultimately acknowledged in his testimony that he had indeed promised Shih 50% of the plaintiffs' recovery, ostensibly in recognition of Shih's role as a business developer for FESI in Taiwan.  In light of Shih's financial stake in the outcome, his unwillingness to admit to that stake, and his demeanor when testifying, the court did not find him credible as a general matter.

41.  Finally, the court cannot credit the testimony of Dennis Chao.  Forrester contacted Chao about providing an affidavit and other evidence in this matter in June 2009.  Chao agreed to provide this evidence only if Forrester paid him.  After consulting with his attorney, Forrester determined that he could not specifically pay Chao to provide evidence. Instead, Forrester and Chao worked out an alternate arrangement in which FESI paid Chao $55,000, ostensibly to develop FESI's business in Taiwan.  This "business development" agreement (which, at least as of Chao's testimony in August 2011, had produced no income for Forrester and FESI) appears to be a façade erected to mask payments made by Forrester to Chao in exchange for his testimony and assistance in this action.  Indeed, just one week after Forrester wired $55,000 to Chao, he signed the first of the several affidavits he provided in this case.

Forrester also insinuated, in an e-mail to Chao, that further payment might be forthcoming if he and FESI were successful in their litigation against Wheelabrator.  In light of the circumstances under which Forrester obtained Chao's coöperation and evidence, the court cannot find Chao's testimony trustworthy.

### Rulings of Law

42.  As noted, Forrester and FESI have advanced three claims against Wheelabrator:  unfair and deceptive trade practices in violation of the New Hampshire Consumer Protection Act ("CPA"), N.H. Rev. Stat. Ann. § 358-A, tortious interference with contractual relationship, and tortious interference with prospective advantage.

43.  Each of plaintiffs' claims is subject to the three-year statute of limitations set forth in N.H. Rev. Stat. Ann. § 508:4, I.  See Forrester, 2011 DNH 212 at 22-24 & n.10. That statute provides:

> Except as otherwise provided by law, all personal actions, except actions for slander or libel, may be brought only within 3 years of the act or omission complained of, except that when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable

24

> diligence should have discovered, the injury and
> its causal relationship to the act or omission
> complained of.

44. "A cause of action arises, thereby triggering the running of the three-year statute, once all the elements necessary for such a claim are present." *Singer Asset Fin. Co., LLC v. Wyner*, 156 N.H. 468, 477-78 (2007). The expiration of the statute of limitations is an affirmative defense that the defendant bears the burden of proving by a preponderance of the evidence. See *State v. Lake Winnipesaukee Resort, LLC*, 159 N.H. 42, 45 (2009).

45. To the extent plaintiffs' claims are premised upon Mark Lyons' alleged June 14, 2007 misrepresentations to Dennis Chao, those claims naturally cannot have arisen any earlier than the date those misrepresentations were made. Because plaintiffs filed this action well before June 14, 2010, any claims premised on the events of June 14, 2007, are not barred by the statute of limitations. Insofar as those claims are premised on other, earlier misrepresentations and conduct of Wheelabrator, however, they are barred by the statute of limitations.

46. Plaintiffs' claims for tortious interference with contractual relationship and tortious interference with prospective advantage are essentially identical. Each

requires that "(1) the plaintiff had an economic
relationship with a third party; (2) the defendant knew of
this relationship; (3) the defendant intentionally and
improperly interfered with this relationship; and (4) the
plaintiff was damaged by such interference." Singer Asset
Fin., 156 N.H. at 478 (reciting elements of intentional
interference with contractual relations); M&D Cycles, Inc.
v. Amer. Honda Motor Co., Inc., 208 F. Supp. 2d 115, 119
(D.N.H. 2002) (reciting elements of intentional interference
with prospective advantage).

47. To the extent they are premised upon Wheelabrator's conduct
prior to June 14, 2007, plaintiffs' tortious interference
claims arose no later than the end of 2006.  Plaintiffs'
economic relationship with Kobin, as well as Wheelabrator's
knowledge of that relationship, had already been established
by the end of 2004.  By the end of November 2006,
Wheelabrator had already taken several actions that
allegedly interfered with plaintiffs' relationship with
Kobin; for purposes of these rulings, the court assumes
those actions were improper.  And by early December 2006,
the final element had fallen into place:  plaintiffs were
allegedly damaged by this interference when Kobin did not

26

place an order for DCPDHP that month, as one would expect based upon the pattern of its prior orders.[6]

48.   To state a claim under the CPA, a plaintiff must prove, at a minimum, that:  "(1) the defendant is a person; (2) the defendant used an unfair method of competition or a deceptive act or practice; and (3) the act occurred in trade or commerce."  Milford Lumber Co., Inc. v. RCB Realty, Inc., 147 N.H. 15, 20 (2001).

49.   To the extent it is premised upon Wheelabrator's conduct prior to June 14, 2007, plaintiffs' CPA claim also arose no later than the end of 2006.  Wheelabrator is a "person" within the meaning of the CPA, and as far as the court can tell, has been since its inception.  See N.H. Rev. Stat.

---

[6]Plaintiffs have attempted to put a finer point on the damage they incurred, arguing that Kobin's alleged "termination" of its contract with FESI in June 2007 is the key injury for limitations purposes.  But New Hampshire law is clear that a claim accrues when a plaintiff suffers "some harm caused by the defendant's conduct"; the limitations period is not tolled "until the full extent of the plaintiff's injury has manifested itself." Lamprey v. Britton Constr., Inc., 163 N.H. 252, 257 (2012) (emphasis added); cf. also Singer Asset Fin., 156 N.H. at 478 ("[A] claim based on a single tort ordinarily accrues when the tort is completed, and the continuing accrual of injury or damages does not extend the accrual date.").  Thus, even if Kobin actually did terminate its contract with Wheelabrator in June 2007, as plaintiffs contend--a contention the court rejects, as set forth supra--that does not affect whether some or all of plaintiffs' claims are barred by the statute of limitations, because plaintiffs had already suffered some injury well in advance of that alleged termination.

Ann. § 358-A:1, I (defining "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity"). Its alleged misrepresentations to Kobin, which, with the exception of Mark Lyons' June 14, 2007 statements, occurred before the end of 2006, were made in the course of its trade or commerce.  See id. § 358-A:1, II (defining "trade" and "commerce" as including "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate").

50.  Plaintiffs do not appear to seriously contest that their claims had arisen by the end of 2006 (with the exception, of course, of any claims premised upon the alleged June 14, 2007 misrepresentations).  But see n.4 supra.  Because they did not file this action until February 23, 2010, New Hampshire's three-year limitations period would ordinarily bar those claims.  See N.H. Rev. Stat. Ann. § 508:4, I. Plaintiffs argue, however, that they may take advantage of the statute's "discovery rule" exception.

51.  "Under the discovery rule exception to the statute of limitations, 'when the injury [complained of] and its causal

relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission,' the limitations period will only begin to run when 'the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of.'" Keshishian v. CMC Radiologists, 142 N.H. 168, 176-77 (1997) (quoting N.H. Rev. Stat. Ann. § 508:4, I).  "Although a cause of action arises as soon as all of the necessary elements are present, it does not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, both the fact of an injury and the cause thereof."  Beane v. Dana S. Beane & Co., P.C., 160 N.H. 708, 712 (2010) (quoting Conrad v. Hazen, 140 N.H. 249, 251-52 (1995)) (internal citation omitted).

52. Though the statute of limitations is an affirmative defense on which the defendant bears the burden of proof, once that burden is satisfied "by a showing that the action was not brought within three years of the act or omission of which the plaintiff complains," the burden shifts to the plaintiff to prove, by a preponderance of the evidence, that the discovery rule applies.  Lamprey v. Britton Constr., Inc.,

163 N.H. 252, 257 (2012); see also, e.g., Kelleher v. Marvin
Lumber & Cedar Co., 152 N.H. 813, 852 (2005).

53. "The discovery rule is two-pronged, and both prongs must be
satisfied before the statute of limitations begins to run.
First, a plaintiff must know or reasonably should have known
that she has been injured; second, a plaintiff must know or
reasonably should have known that her injury was proximately
caused by conduct of the defendant." Lamprey, 163 N.H. at
257.

54. In the present case, plaintiffs knew that they had been
injured by December 6, 2006. After Kobin's October 15, 2006
order, plaintiffs expected, based upon the rhythm of Kobin's
prior orders, to have received another order by that date.
No order was forthcoming. Indeed, on December 6, 2006, Shih
and Forrester spoke about Kobin's abrupt cessation of
orders, demonstrating their awareness of the injury. See ¶
22, supra.

55. Although plaintiffs attempt to recast their "injury" as
Kobin's alleged termination of its contract with FESI, that
termination, even if it actually occurred, is irrelevant in
light of the undisputed injury plaintiffs suffered from the
cessation of orders in December 2006. See n.5, supra.
Again, the discovery rule "is not intended to toll the

statute of limitations until the full extent of the plaintiff's injury has manifested itself.  Rather, once the plaintiff could reasonably discern that he or she suffered some harm . . . , the tolling ends."  Lamprey, 163 N.H. at 257.

56. Plaintiffs were also aware of Wheelabrator's alleged (pre-June 14, 2007) misconduct by December 2006.  Forrester testified that he knew as early as 2004 that Wheelabrator was telling Kobin that it owned patent rights that, in his opinion, it did not own.  In April 2005, Wheelabrator informed Forrester himself of its belief that FESI was using Wheelabrator's proprietary technical information in its dealings with Kobin.  The following month, Forrester accused Wheelabrator itself of misconduct in its dealings with Kobin; he testified that this letter was authored in the belief that Wheelabrator had "made a statement that . . . was derogatory and illegal" in an attempt to dissuade Kobin from doing business with him.  And, during a March 2006 meeting with Forrester, Kobin representatives informed him of a letter they had recently received from Wheelabrator's general counsel, who claimed that WES-PHix "covers the use of any solid, liquid, or chemical form of phosphate."  Exh. GG.

57.  Plaintiffs may not have learned about each discrete occasion
     on which Wheelabrator allegedly made a misstatement of this
     nature until sometime after December 2006.  But for purposes
     of the discovery rule, "[i]t is not necessary that [they]
     knew the full extent of, or the particulars of,
     [Wheelabrator's] wrongful conduct."  Randall v. Laconia, 679
     F.3d 1, 8 (1st Cir. 2012) (applying New Hampshire law).

58.  Finally, plaintiffs knew or should have known of the
     possible causal connection between their injury and
     Wheelabrator's misconduct almost as soon as they were aware
     of the injury itself, and certainly no later than January
     19, 2007.  As just noted, Forrester knew that Wheelabrator
     had made several representations to Kobin that he believed
     to be false, at least one of which he believed was made with
     the intent to interfere in the FESI/Kobin relationship.
     Plaintiffs' lengthy history with Wheelabrator, moreover, was
     marked by Wheelabrator regularly making assertions that
     Forrester thought overstated its intellectual property
     rights to the detriment of FESI.  In light of this history,
     Forrester and FESI had every reason to believe that (a)
     Wheelabrator had continued to make such assertions to Kobin,
     and (b) Kobin, notwithstanding Forrester's attempts to
     assuage its concerns, finally succumbed to pressure from

32

Wheelabrator and discontinued its purchases from FESI.
Indeed, Forrester himself conceded at the evidentiary
hearing that when he learned in January 2007 that Kobin
might be resuming its use of WES-PHix, he suspected that
this was due to Wheelabrator's misstatements regarding its
intellectual property rights.

59.  Plaintiffs ultimately did not become certain that
Wheelabrator's conduct was the cause of their injury until
some later date.  But "the plaintiff need not be certain of
the causal connection" for the limitations period to begin
running; "the reasonable possibility that it existed will
suffice to obviate the protections of the discovery rule."
Lamprey, 163 N.H. at 257.  And, as just discussed,
plaintiffs were aware of the reasonable possibility that
there was a causal connection between Wheelabrator's conduct
and their injury no later than January 19, 2007.

60.  The court therefore concludes that, with regard to alleged
misconduct by Wheelabrator that predates June 14, 2007,
plaintiffs "discover[ed], or in the exercise of reasonable
diligence should have discovered, the injury and its causal
relationship to the act or omission complained of" by
January 19, 2007.  Accordingly, the three-year limitations
period for any claims premised upon that misconduct ended on

33

January 19, 2010. N.H. Rev. Stat. Ann. § 508:4, I.  Because plaintiffs did not file this action until February 23, 2010, § 508:4, I serves to bar those claims.

## **Conclusion**

Based on the foregoing, the court concludes that the applicable statute of limitations, N.H. Rev. Stat. Ann. § 508:4, I, bars plaintiffs' claims except to the extent they are premised upon alleged misrepresentations made to representatives of Kobin Environmental Enterprise Co., Ltd. by Wheelabrator on or around June 14, 2007.

**SO ORDERED.**

_____
Joseph N. LaPlante
United States District Judge

Dated:  August 15, 2012

cc:  Erik Graham Moskowitz, Esq.
     Michael J. Markoff, Esq.
     Sibley P. Reppert, Esq.
     Steven E. Grill, Esq.
     Jonathan M. Shirley, Esq.