UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Forrester Environmental
Services, Inc. and Keith E.
Forrester

          v.                         Civil No. 10-cv-154-JL
                                     Opinion No. 2012 DNH 139
Wheelabrator Technologies, Inc.


**MEMORANDUM ORDER**

Plaintiffs Keith Forrester and his company, Forrester
Environmental Services, Inc., filed this suit against defendant
Wheelabrator Technologies, Inc., alleging that Wheelabrator
interfered with plaintiffs' relationship with a Taiwanese waste
treatment company, Kobin Environmental Enterprise, by falsely
claiming that Wheelabrator owned the U.S. patent rights to
plaintiffs' intellectual property, among other things.[1]  After
twice amending their complaint, plaintiffs sought to pursue four
claims against Wheelabrator:  unfair and deceptive trade
practices in violation of the Consumer Protection Act, N.H. Rev.
Stat. Ann. § 358-A; tortious interference with contractual
relationship; tortious interference with prospective advantage;
and trade secret misappropriation in violation of the Uniform

---

[1]Because plaintiffs' right to relief necessarily depends on
the resolution of substantial questions of federal patent law,
this court has jurisdiction pursuant to 28 U.S.C. §§ 1331
(federal question) and 1338 (patent).  See U.S. Valves, Inc. v.
Dray, 212 F.3d 1368, 1372 (Fed. Cir. 2000).

Trade Secrets Act, N.H. Rev. Stat. Ann. § 350-B.  The court granted summary judgment in favor of Wheelabrator on this last claim, as plaintiffs could proffer no evidence to support it. Forrester Envtl. Servs., Inc. v. Wheelabrator Techs., Inc., 2011 DNH 212, 29-35.  And, after conducting a pretrial evidentiary hearing, the court concluded that the three-year statute of limitations set forth in N.H. Rev. Stat. Ann. § 508:4 barred plaintiffs' remaining three claims except to the extent those claims were premised upon alleged misconduct by Wheelabrator on or around June 14, 2007.  Forrester Envtl. Servs., Inc. v. Wheelabrator Techs., Inc., 2012 DNH 138.

Following the evidentiary hearing, the court harbored serious doubts about whether plaintiffs had suffered any injury as a result of Wheelabrator's alleged June 14, 2007 misconduct. The court therefore directed plaintiffs to show cause why summary judgment should not be entered in favor of Wheelabrator on all three of their remaining claims.  See Order of May 8, 2012; Order of July 9, 2012.  Both plaintiffs and Wheelabrator filed memoranda in response.

Based on those materials, the court rules that plaintiffs have failed to make this showing, and enters summary judgment in favor of Wheelabrator on all three of plaintiffs' remaining claims.  As explained herein, plaintiffs have not produced any

2

admissible evidence that they suffered injury as a result of
Wheelabrator's conduct on June 14, 2007, but have offered only
inadmissible documents and speculation.  Because injury is an
essential element of each of plaintiffs' claims, summary judgment
must enter against them.

## I.    Applicable legal standard

Federal Rule of Civil Procedure 56(f)(1) permits this court,
"[a]fter giving notice and a reasonable time to respond," to
"grant summary judgment for a nonmovant."  When utilizing this
procedure, the court applies the same standard set forth in Rule
56(a); in other words, "[s]ummary judgment is appropriate when
there is no genuine issue of material fact and [one party] is
entitled to judgment as a matter of law." Sánchez-Rodríguez v.
AT&T Mobility Puerto Rico, Inc., 673 F.3d 1, 9 (1st Cir. 2012).
To avoid summary judgment, the party against whom Rule 56(f)(1)'s
procedure is invoked must demonstrate, "through submissions of
evidentiary quality, that a trialworthy issue persists." Id.  In
considering those submissions, "the court views all facts and
draws all reasonable inferences in the light most favorable" to
that party. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir.
2010).  But the court need not credit "conclusory allegations,
improbable inferences, or unsupported speculation." Meuser v.

Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009).  The
following factual recitation is consistent with that standard.

## II.  **Background**[2]

Plaintiff Keith Forrester is a former employee of
Wheelabrator Environmental Systems, the predecessor to defendant
Wheelabrator Technologies, Inc.  Wheelabrator is primarily
engaged in the business of operating municipal waste-to-energy
facilities (in lay terms, burning trash to generate energy).  It
has also developed a process, "WES-PHix," that uses phosphates to
immobilize heavy metals in incinerator ash, thus preventing them
from leaching into groundwater.  As described in Wheelabrator's
patents, WES-PHix employs "water soluble phosphates," i.e.,
phosphates "soluble in water at about 20º C at least to the
extent of about five weight-volume percent," to achieve this
result.  While employed at Wheelabrator, Forrester was involved
in the development of WES-PHix (and, indeed, is named as inventor
on some of Wheelabrator's WES-PHix patents).

Forrester left Wheelabrator in 1992 and subsequently formed
his own company, plaintiff Forrester Environmental Systems, Inc.

---

[2]The facts set forth herein are based on the materials the
parties submitted in response to its show cause orders, the
evidence adduced at the evidentiary hearing, and the materials
the parties submitted with their various motions for summary
judgment in this case.

("FESI").  Like Wheelabrator, FESI has developed a process,
"FESI-BOND," that uses phosphates to immobilize the heavy metals
in incinerator ash, and has patented certain aspects of that
process.  The phosphates used in the FESI-BOND process are less
soluble than those disclosed in Wheelabrator's patents (though
Wheelabrator has itself used triple super phosphate, a less-
soluble phosphate, with WES-PHix on at least one occasion).
Moreover, while WES-PHix typically requires a "wet" application,
i.e., water must be added to the mixture of phosphate and ash,
FESI-BOND's application is "dry," i.e., does not require water.[3]
Both Wheelabrator and FESI license or sell the right to practice
their respective processes to companies that need to stabilize
the heavy metals in their ash.

In 2001, Wheelabrator licensed the exclusive right to
practice WES-PHix in Taiwan to Bio-Max Environmental Engineering
Company, Ltd., which in turn sub-licensed the right to practice
WES-PHix to Kuo-bin Ceramic, Inc. Co., Ltd. ("Kobin").[4]  Both the

---

[3]At least two of Wheelabrator's patents, however, teach that
"a wet or dry application of the phosphates" may be used in the
inventions disclosed therein.  U.S. Patent Nos. 5,245,114;
5,430,233.

[4]Kuo-Bin Ceramic, Inc. Co. subsequently changed its name to
Kobin Environmental Enterprise Co., Ltd.  As the name change is
not material to the issues in this action, the court refers to
the company as "Kobin" both pre- and post-name change.

license and sub-license defined WES-PHix as "the process of stabilizing metals, such as lead and cadmium, in solid residues . . . using chemicals such as lime [and/or] phosphate, which has been developed by [Wheelabrator]."  The sub-license required Kobin to pay a royalty to Bio-Max for each ton of ash it treated with WES-PHix; if Bio-Max's license with Wheelabrator terminated or expired, the sub-license required Kobin to pay the royalty directly to Wheelabrator.

In mid-2004, FESI learned that Kobin was dissatisfied with WES-PHix, in part because of a strong odor it caused, which had prompted complaints from the neighborhood surrounding Kobin's Taipei, Taiwan facility.  FESI began discussions with Kobin about potentially licensing FESI-BOND for use at that facility, and, on August 24, 2004, Kobin entered into a "Stabilization Chemical Supply Agreement" with FESI.  Under the agreement, FESI granted Kobin an exclusive right to use its FESI-BOND process in Taiwan and to market the process to other Taiwanese companies.  Kobin, in turn, agreed to purchase phosphates from FESI.  The agreement had a ten-year term, renewable at Kobin's election.

To treat the ash at Kobin's facility in a way that reduced the unpleasant odor associated with WES-PHix, Forrester developed a variation of FESI-BOND that involved the use of dicalcium phosphate dihydrate powder, or "DCPDHP."  From April 2005 through

6

the fall of 2006, Kobin made regular monthly purchases of DCPDHP from FESI under the Stabilization Chemical Supply Agreement. Those purchases abruptly ceased in late 2006.  After Kobin ordered a shipment of DCPDHP from FESI on or about October 15, 2006, it did not place another order with FESI for over a year.[5]

---

[5]The precise reason Kobin discontinued purchasing DCPDHP from FESI at this time is unclear.  Beginning in 2004 and continuing through 2006, however, Wheelabrator made statements regarding WES-PHix to Kobin that, according to plaintiffs, dramatically overstated the scope of Wheelabrator's intellectual property rights.  By way of example, shortly after Bio-Max's license with Wheelabrator expired in early 2006--obligating Kobin to pay a royalty directly to Wheelabrator for its use of WES-PHix--Wheelabrator wrote to Kobin regarding its supposed failure to pay that royalty, claiming that "the definition of WES-PHix in the Sublicense Agreement covers the use of any solid, liquid or chemical form of phosphate."  The letter also stated that Kobin's use of any "phosphate-based process to treat municipal waste combustion ash"--which, though not explicitly expressed, would have included the use of FESI-BOND and DCPDHP--amounted to a use of WES-PHix.

Plaintiffs previously argued that these and other, similar statements caused Kobin's cessation of purchases.  Their evidence of this was equivocal at best.  Dennis Chao, the only former Kobin employee to testify, admitted he was not involved in Kobin's 2006 decision to stop purchasing DCPDHP and that he did not know why the decision was made.  Both Chao and Forrester speculated that cost could have been the reason for the decision, and a report Chao purportedly prepared at a later date attributed the end of Kobin's relationship with FESI to a simple "change in decision making."  Of course, the reason for Kobin's abandonment of FESI-BOND and DCPDHP in 2006 is ultimately immaterial because, as this court previously held, the statute of limitations bars plaintiffs from recovering for that harm even if Wheelabrator caused it.  Forrester Envtl. Servs., Inc. v. Wheelabrator Techs., Inc., 2012 DNH 138.

Shortly thereafter, on November 8, 2006, Wheelabrator licensed the right to practice WES-PHix in Taiwan to EMMA Best Industrial Limited, an entity affiliated with Kobin.  That same date, EMMA granted a sub-license to Kobin that superseded Kobin's 2001 sub-license.  In contrast to the previous license and sub-license, the new license and sub-license defined WES-PHix as

> the patented . . . and proprietary process of immobilization of metals, such as lead and cadmium in solid residues . . . using any solid, liquid or chemical form of phosphate and/or lime.  WES-PHix embodies Confidential Technical Information that is not in the public domain and that is only disclosed to licensees.

That definition potentially encompassed both FESI-BOND and the use of DCPDHP, a "solid . . . form of phosphate."  Like Kobin's 2001 sub-license, the 2006 sub-license required Kobin to pay a royalty for each ton of ash it treated with WES-PHix.

Neither the new license nor the new sub-license specified which chemicals should be used with WES-PHix or required Kobin to purchase chemicals from any particular source.  In early October 2008, though, while the licenses were still being negotiated, Dennis Chao, Managing Director of Kobin's Project Department, wrote an e-mail to Mark Lyons of Wheelabrator, noting:

> According to the Agreement WES-PHix can be supplied in solid form (powder) which has the advantage of no-stink smell comparing with the liquid type of WES-PHix.  The said smell stays with the aggregate for a long period of time that cause *[sic]* the neighborhood near the

> aggregate storage area complaining and fighting *[sic]*
> against it.
>
> As we agreed in the Agreement to use WES-PHix for the
> stabilization of bottom ash (aggregate) in our . . .
> plant, the solid form of WES-PHix will be used instead
> of the original liquid type.

Presumably, Kobin began using a "solid form of WES-PHix" at its

facility after signing the 2006 WES-PHix sub-license.  The

record, however, is devoid of any information on precisely what

stabilization technology Kobin employed at this time, apart from

Dennis Chao's testimony that Kobin used some form of phosphate.

Wheelabrator, EMMA, and Kobin operated under the 2006

license arrangement until mid-2007, when Kobin asked Wheelabrator

to restructure the existing arrangement so Kobin could license

the right to use WES-PHix directly from Wheelabrator, rather than

sub-licensing it from EMMA.  Wheelabrator agreed and prepared

documents cancelling the 2006 EMMA license and licensing WES-PHix

directly to Kobin.  The draft Wheelabrator-Kobin license

contained a definition of WES-PHix identical to that in the 2006

license and sub-license, and required Kobin to "use WES-PHix to

treat all ash residues."  Dennis Chao testified that while the

new license was being negotiated, Kobin--doubting that

Wheelabrator's patents covered "any solid form of phosphate

and/or lime"--had requested that phrase be deleted from the

license's definition of WES-PHix, but Wheelabrator insisted that the phrase remain.[6]

Chao traveled to Wheelabrator's Hampton, New Hampshire headquarters on June 14, 2007, to sign the new license on Kobin's behalf.  By this time, Chao testified, the terms of the license had been negotiated and approved in all respects by his superiors at Kobin, and he retained only the authority to make minor changes to the language of the license.  Before signing the new license, Chao says, he asked Wheelabrator's representative, Mark Lyons, to confirm that the WES-PHix patents covered any solid form of phosphate and/or lime.  Lyons, Chao claims, guaranteed that Wheelabrator's patents covered any solid form of phosphate. Having received this assurance, Chao executed the new license.

In the meantime, Forrester and FESI had become concerned that they had received no further orders from Kobin since October 15, 2006.  On January 19, 2007, and again on May 30, 2007, Forrester wrote to Kobin expressing worry about its cessation of WES-PHix purchases; those letters went unanswered.  Finally, Forrester and FESI's agent for Taiwan, Hangshin Shih, were able

---

[6]This was important to Kobin because, according to Chao, the local government entity that had retained Kobin to incinerate its waste required Kobin to license whatever stabilization technology it chose to use from the company that owned the patent rights to that technology.

to secure a meeting with Kobin management.  On June 27, 2007, they met with Dennis Chao and his supervisor, Jerry Chen, in Taipei.  At the meeting, Chao and Chen told Forrester that Kobin was terminating its supply agreement with FESI.

None of those present testified that Chao or Chen expressly gave a reason at this meeting for Kobin's decision to terminate the agreement.  However, according to Hangshin Shih, Chao and Chen said that FESI's "chemical price [was] way high."  They also told Forrester at the meeting that Wheelabrator had claimed that it (1) held patents on the use of all solid phosphates, and (2) had prevailed over FESI in a court case in the United States. Chao and Chen asked FESI to send Kobin a comparison of Wheelabrator's and FESI's patents.  Following the meeting, FESI did so, and also prepared a new price schedule for Kobin.

In early 2008, Kobin resumed making regular purchases of DCPDHP from FESI.  FESI's profit margin on these renewed sales was significantly lower than its profit margin on its prior sales to Kobin.  In early 2009, Kobin again stopped purchasing DCPDHP from FESI and has not resumed those purchases.  Plaintiffs presented no evidence regarding Kobin's reason for stopping its DCPDHP purchases in 2009.

11

III. **Analysis**

As noted at the outset, this court has concluded that it must grant summary judgment to Wheelabrator on plaintiffs' remaining claims.  That conclusion follows from (1) plaintiffs' failure to proffer any admissible evidence creating a genuine issue of material fact as to whether they were injured by Wheelabrator's alleged misconduct; and (2) the necessity of injury to plaintiffs' recovery under the facts of this case.

A.   **Plaintiffs' tort claims**

As recited above, plaintiffs' evidence shows that Kobin stopped making regular purchases of DCPDHP from FESI in October 2006, and shortly thereafter signed a new license to use WES-PHix.  Before signing that license, Kobin sought confirmation from Wheelabrator that it could use a "solid form (powder)" of WES-PHix in order to avoid the odor problems which had plagued it during its earlier use of WES-PHix's "liquid form."  Kobin had discovered the comparative advantages of a "solid" or "dry" phosphate process from FESI and Forrester, whose FESI-BOND was just such a process.

Seven months later, in June 2007, Kobin signed a new license with Wheelabrator.  Before doing so, it again sought confirmation that Wheelabrator's patents covered any solid form of phosphate, Wheelabrator assured Kobin that they did, and, based upon its

12

understanding of the local government's requirements, Kobin signed the license. At a meeting later that month, Kobin informed plaintiffs that it was terminating its chemical supply agreement with FESI. It did not give a reason for the termination, but mentioned both the cost of chemicals and Wheelabrator's alleged misstatements. Less than a year later, Kobin began purchasing DCPDHP from FESI again.

That is the long and the short of plaintiffs' evidence, and it reveals no causal link of any kind between Wheelabrator's alleged June 2007 misstatements and any injury to them. Kobin had already abandoned purchases from plaintiffs more than six months before those misstatements. Plaintiffs have offered nothing of evidentiary quality to suggest that, had these misstatements not been made, Kobin would have upended the status quo and resumed purchasing DCPDHP from them, or not terminated its contract with them. At best, the evidence shows that Kobin might not have signed its June 2007 license with Wheelabrator in the absence of Wheelabrator's misconduct. But there is no admissible evidence that, had Kobin refused to sign that license, it would have then terminated its existing sub-license for WES-PHix and begun purchasing DCPDHP from plaintiffs again.

There is evidence that in late 2006––months before the alleged misconduct––Kobin wanted to use a "solid form" phosphate

13

to treat its ash.  But plaintiffs proffer no evidence that Kobin's wishes remained the same in mid-2007, such that it would not have chosen to use an alternative, non-phosphate-based treatment such as the "water wash" that both Forrester and Hangshin Shih mentioned in their testimony, rather than WES-PHix. And even assuming that Kobin did still wish to use a "solid form" phosphate in mid-2007, there is no evidence that it would have chosen plaintiffs' "solid form" of FESI-BOND over Wheelabrator's "solid form" of WES-PHix or other "solid form" phosphate treatments offered in the industry.[7]  As Judge Learned Hand once observed:

> In an open market it is generally impossible to prove that a customer, whom the defendant has secured by falsely describing his goods, would have bought of the plaintiff, if the defendant had been truthful.  Without that, the plaintiff, though aggrieved in company with other honest traders, cannot show any ascertainable loss. . . . The law does not allow him to sue as a vicarious avenger of the defendant's customers.

---

[7] Plaintiffs presented no evidence that Wheelabrator and FESI are the only businesses that sell or license phosphate-based stabilization processes to the public, or that they are the only businesses to have sought to patent such processes.  There was evidence that WES-PHix and FESI-BOND were the only phosphate-based processes for which Kobin had obtained permits from the Taiwanese authorities.  But there is no evidence whatsoever that the permitting procedure was so lengthy or bureaucratically complicated that it would have effectively prevented Kobin from obtaining a permit for another phosphate-based process.

Ely-Norris Safe Co. v. Mosler Safe Co., 7 F.2d 603, 604 (2d Cir. 1925).

In an effort to surmount that problem, plaintiffs proffer a report that Dennis Chao purportedly prepared following the June 27, 2007 meeting in Taipei.  As this court previously noted, that report could be read to suggest "that Kobin was contemplating the purchase of chemicals from plaintiffs in the future, but due to Wheelabrator's alleged fraud, believed it could not do so and therefore terminated its existing contract with plaintiffs." Forrester Envtl. Servs., Inc. v. Wheelabrator Techs., Inc., 2012 DNH 022, 8.  But the problem with the report--a problem that first became clear to the court upon hearing Chao's testimony at the evidentiary hearing in this matter--is that it is inadmissible hearsay.  See Fed. R. Evid. 801, 802.  Plaintiffs assert that the report is admissible under Federal Rule of Evidence 803(6) as a Kobin business record, but the court does not agree.

Rule 803 sets forth a list of exceptions to the rule against hearsay, one of which is the so-called "business record" exception in Rule 803(6).  Rule 803(6) creates an exception for

> [a] record of an act, event, condition, opinion, or
> diagnosis if:

(A) the record was made at or near the time by –
or from information transmitted by – someone with
knowledge;

(B) the record was kept in the course of a
regularly conducted activity of a business,
organization, occupation, or calling, whether or
not for profit;

(C) making the record was a regular practice of
that activity;

(D) all these conditions are shown by the
testimony of the custodian or another qualified
witness . . . ; and

(E) neither the source of information nor the
method or circumstances of preparation indicate a
lack of trustworthiness.

The report in question fails to meet several of the rule's

prerequisites.

First, the report was not prepared "at or near the time" of

the events in question; those events occurred at least one, and

as much as ten, months prior to the report's preparation.  Cf.

Willco Kuwait (Trading) S.A.K. v. deSavary, 843 F.2d 618, 628

(1st Cir. 1988) (passage of three months between events and

preparation of report failed to satisfy Rule 803(6)(A)).  Second,

the report was not "kept in the course of a regularly conducted

activity of" Kobin, and making the report was not a "regular

practice" of that activity.  Chao testified that the report was

generated through a series of internal meetings he held after

Kobin's management requested that he look into FESI's complaints

and make recommendations on how to proceed. In other words, Kobin created the report in the course of addressing a specific dispute that arose with one of its suppliers, and not as a "regular" part of its business in any sense of the word. Cf. United States v. Strother, 49 F.3d 869, 876 (2d Cir. 1995) (declining to interpret Rule 803(b) to "permit the introduction into evidence of memoranda drafted in response to unusual or 'isolated' events"); Ebenhoech v. Koppers Indus., Inc., 239 F. Supp. 2d 455, 463-64 (D.N.J. 2002) (report created "to document an unusual incident" was "not a report made in the regular course of business").

Third and finally, the circumstances in which the report was purportedly prepared "indicate a lack of trustworthiness." On its face, the report indicates that Forrester had already threatened to take legal actions in both the United States and Taiwan, accused Kobin of violating the law, and suggested he would subpoena Kobin's directors. Chao also testified that Kobin considered its dispute with FESI a "legal matter" and that, therefore, the legal department assisted in preparing the report. Records such as this, which have been "prepared with an eye to litigation," generally do not meet the criteria for admissibility under Rule 803(6). United States v. Goodchild, 25 F.3d 55, 62 (1st Cir. 1994). That is so not only because records prepared

17

for litigation are generally not prepared "in the course of a regularly conducted activity," but also because records made in anticipation of litigation tend to be less trustworthy than records made in the ordinary course of business.  See House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co., Inc., 775 F. Supp. 2d 302, 315 (D. Mass. 2011) (citing Palmer v. Hoffman, 318 U.S. 109, 113-14 (1943)); see also Ebenhoech, 239 F. Supp. 2d at 463-64.  The court finds that to be true of this report as well.[8]

The court accordingly concludes that plaintiffs are unable to demonstrate that they suffered any injury as a result of Wheelabrator's alleged misconduct.[9]  That necessarily defeats their claims for tortious interference with contractual relationship and prospective advantage.  To recover under either of those theories, Forrester and FESI must demonstrate that they

---

[8]This is to say nothing of the untrustworthiness of the source of the report, Dennis Chao.  See Forrester Envtl. Servs., Inc. v. Wheelabrator Techs., Inc., 2012 DNH 138, ¶¶ 38, 41.

[9]In one of their filings, plaintiffs assert they suffered injury because "[t]he evidence shows that [Wheelabrator's] false representations were made about Plaintiffs' technology so that [Wheelabrator] would obtain royalties for Kobin's use of Plaintiffs' technology."  Document no. 246 at 5.  It suffices to say that this is a gross misstatement of what the evidence shows.

As a further aside, the court recognizes the possibility that a plaintiff might suffer some reputational injury when one of its competitors claims to own the plaintiff's intellectual property, as is alleged here.  But the plaintiffs in this case have not claimed to have suffered any such injury, so the court does not consider that possibility now.

were injured by Wheelabrator's alleged interference with their
relationship with Kobin.  See Singer Asset Fin. Co, LLC v. Wyner,
156 N.H. 468, 478 (2007); M&D Cycles, Inc. v. Amer. Honda Motor
Co., Inc., 208 F. Supp. 2d 115, 119 (D.N.H. 2002).

### B.   Consumer Protection Act

The effect of plaintiffs' inability to demonstrate injury on
their Consumer Protection Act ("CPA") claim is less clear-cut.
Under § 358-A:10 of the CPA, "[a]ny person injured by another's
use of any method, act or practice declared unlawful under this
chapter may bring an action for damages and for such equitable
relief . . . as the court deems necessary and proper."  The plain
language of this section would seem to mandate that only
"person[s] injured" by an unlawful act or practice may bring
suit.  But this court must "look to the pronouncements of a
state's highest court in order to discern the contours of that
state's law."  Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011).
And in Becksted v. Nadeau, 155 N.H. 615, 620-21 (2007), the New
Hampshire Supreme Court, relying on its earlier decisions in
Preferred National Insurance Co. v. Docusource, Inc., 149 N.H.
759, 767 (2003) and Carter v. Lachance, 146 N.H. 11, 14 (2001),
held that a plaintiff who fails to show an injury may still
recover statutory damages under the CPA.

At first blush, Becksted would appear to be dispositive of the question.  This court, however, has serious reservations about the CPA's applicability to the situation here, in which plaintiffs were neither parties to the transaction in which the unfair and deceptive act occurred, nor suffered injury as a result of that act.  To be sure, the New Hampshire Supreme Court has also held that a plaintiff need not be in "privity" with the defendant (i.e., be the direct object or victim of the defendant's act) to recover under the CPA.  See, e.g., LaChance v. U.S. Smokeless Tobacco Co., 156 N.H. 88, 93-95 (2007); Remsburg v. Docusearch, Inc., 149 N.H. 148, 159-60 (2003).  When viewed in conjunction with the Becksted line of cases, these cases could be read to suggest that plaintiffs can recover under the circumstances presented in this case (i.e., no privity and no injury).

But the New Hampshire Supreme Court has never gone so far as to say that a plaintiff needs neither privity nor injury to bring a CPA claim.  Indeed, in those cases in which that Court ruled no showing of privity was necessary, there was an injury to the plaintiff, and the converse is also true.  Another possible way to reconcile the Becksted line of cases with the Remsburg line is, therefore, to view them as establishing the proposition that a CPA plaintiff must have either suffered injury or been the

object of the defendant's unfair or deceptive act, but need not establish both.  Or, to adopt Wheelabrator's alternative formulation, those cases can be read to establish a rule that where the plaintiff is the object of the defendant's unfair or deceptive act, the existence of an injury is assumed.

As a federal court facing an unsettled question of state law, this court "must make an informed prophecy of what the state's highest court would do in the same situation." Bartlett v. Mut. Pharm. Co., Inc., 731 F. Supp. 2d 135, 154-55 (D.N.H. 2010).  This court believes that the New Hampshire Supreme Court would adopt this latter construction of the CPA, and hold that a plaintiff must, at a minimum, establish either injury or privity to state a claim under the CPA.

In reaching this conclusion, the court is guided in large part by the general rule that a federal court applying state law has "no license to expand [that] law beyond its present limits." Douglas v. York Cnty., 433 F.3d 143, 153 (1st Cir. 2005); see also Nolan, 656 F.3d at 76 ("Our task is thus limited, to the extent possible, to applying state law as it currently exists, not creating new rules or significantly expanding existing ones.").  Were this court to permit plaintiffs to recover on the facts presented here, that would result in an unprecedented expansion of the CPA beyond the scope of its text and

21

interpretive precedent.  It would mean that any third party
uninjured by an unfair or deceptive act would be able to file an
action for statutory damages, seeking to punish that act as a
"private attorney general."  The New Hampshire Supreme Court, as
noted, has never so much as hinted that such private attorney
general actions are permissible under the CPA.  Plaintiffs have
cited, and this court has found, no cases from other New
Hampshire courts that adopt such a broad formulation of the
CPA.[10]  This court will not be first to do so.  Because
plaintiffs were not the victims of Wheelabrator's alleged
misconduct and suffered no injury as a result of it, they may not
recover under the CPA.

**IV.  <u>Conclusion</u>**

    For the reasons set forth above, the court GRANTS summary
judgment to the defendant on all three of plaintiffs' remaining
claims.  Because Wheelabrator's counterclaim against plaintiffs
remains pending, the parties shall confer regarding the

_____

    [10]The New Hampshire Supreme Court frequently looks to
interpretations of the Massachusetts Consumer Protection Act,
M.G.L. c. 93A, when interpreting the CPA.  See, e.g., Chase v.
Dorais, 122 N.H. 600, 602 (1982).  At least one Massachusetts
court has held that chapter 93A does not provide a private cause
of action to a plaintiff that did not engage in a commercial
transaction with the defendant and was not injured by the
defendant's alleged misconduct.  See Hunneman Real Estate Corp.
v. Norwood Realty, Inc., 765 N.E.2d 800, 810 (Mass. App. 2002).

appropriateness of entering a final judgment as to only plaintiffs' claims pursuant to Federal Rule of Civil Procedure 54(b), taking into account the Court of Appeals' instruction that "Rule 54(b) should be employed with great circumspection." González Figueroa v. J.C. Penney Puerto Rico, Inc., 568 F.3d 313, 318 n.3 (1st Cir. 2009). On or before **August 22, 2012,** the parties shall contact the Deputy Clerk to schedule a conference call with the court on this matter.

      **SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: August 15, 2012

cc:  Erik Graham Moskowitz, Esq.
     Michael J. Markoff, Esq.
     Sibley P. Reppert, Esq.
     Steven E. Grill, Esq.
     Jonathan M. Shirley, Esq.